PSINET, INC. et al., Debtors

PSINet, Inc. et al., Plaintiffs,

v.

Cisco Systems Capital Corporation, Defendant,

Bankruptcy No. 01–13213 (REG).
Adversary No. 01–2841(REG).

United States Bankruptcy Court, S.D. New York.

Dec. 18, 2001.

Wilmer, Cutler & Pickering, Washington, D.C., Wilmer, Cutler & Pickering, New York City, By Andrew N. Goldman, and David R. Lurie, Nixon Peabody LLP, New York City, By Robert N. Christmas and Daniel Sklar, for PSINet, Inc. et al.

Murphy, Sheneman, Julian & Rogers, Los Angeles, CA, By David J. Richardson, Otterbourg, Steindler, Houston & Rosen, P.C., New York City, By Remy J. Ferrario, for Cisco Systems Capital Corporation.

## DECISION ON CROSS–MOTIONS FOR SUMMARY JUDGMENT

ROBERT E. GERBER, Bankruptcy Judge.

### Introduction

In this adversary proceeding—one of numerous "recharacterization" adversary proceedings brought by plaintiff, PSINet, Inc., one of the debtors in the above-captioned chapter 11 case ("PSINet," or the "Debtor"), against its equipment lessors—PSINet seeks a declaratory judgment that a "Master Agreement" and related "Lease Schedules," under which defendant Cisco Systems Capital Corporation ("Cisco") provided networking equipment which is held and used by PSINet, are financing agreements that create a security interest and are not "true leases."

PSINet moves for summary judgment granting it the declaratory judgment it seeks—arguing, as discussed more fully below, that this determination, under applicable state law, must be made solely on the economics of the transaction, and that there are no material disputed issues of fact as to the transactions' economics. Cisco says very little on the merits of PSINet's motion, but cross-moves for summary judgment, arguing that PSINet's claims are barred by the statute of limitations—and in particular, the 3–year statute of limitations applicable to "replevin" actions, i.e., an "action to recover a chattel," N.Y. C.P.L.R. ("CPLR") § 214(3), which Cisco contends started to run from the execution of the Master Agreement. Also, and thereby raising a threshold issue, Cisco asks this Court to determine that PSINet's claims are non-core, within the meaning of 28 U.S.C. § 157(b), and that this Court's power, as an Article I court, is limited to drafting proposed findings of fact and conclusions of law, for consideration, *de novo*, by an Article III district judge.

For reasons discussed below, PSINet is plainly entitled to summary judgment granting it the declaratory relief it seeks, unless (a) this Court cannot grant *any* judgment, because the matters before it in this adversary proceeding are non-core, or (b) PSINet's claims are barred by the statute of limitations. Upon consideration of the issues, however, the Court concludes that:

(a) this "recharacterization" action—involving the nature and extent of the parties' rights vis-à-vis property in the lawful possession of the debtor, laying the predicate for determining issues arising under title 11—is a core matter; and

(b) the Debtor's claims are not barred by the applicable statute of limitations—

which, this Court holds, is not CPLR § 214(3) ("an action to recover a chattel"), but rather CPLR § 213(1) ("an action for which no limitation is specifically prescribed by law").

Accordingly, Cisco's motion for summary judgment is denied. Cisco having failed to identify any material disputed issues of fact with respect to any other defense, and PSINet having made a textbook showing of an entitlement to recharacterization as a matter of law, summary judgment in favor of PSINet is granted.

*Facts*

The cross motions arise in one of 22 similar adversary proceedings commenced by PSINet as plaintiff, against various equipment lessors as defendants, under the umbrella of PSINet's chapter 11 case. By way of background (and as relevant to the Court's decision as to whether PSINet's claims are core), brief discussion of the underlying case and the purpose and substance of the adversary proceedings is appropriate. Then the Court addresses the undisputed facts upon which each litigant relies in its summary judgment motion.

*A.*

PSINet is engaged in the business of providing Internet access and web hosting to business customers, governmental entities and educational institutions, delivering its access products over a global fiber network. In part through subsidiaries, PSINet has been engaged in that business in both the United States and a number of other countries around the world. As of December 31, 2000, the total indebtedness of PSINet and its affiliates was said by the Debtor to be approximately $3.7 billion, of which approximately $3.5 billion consisted of senior notes, capital lease obligations and notes payable.

With many of its subsidiaries and affiliates, PSINet filed a petition for relief under chapter 11 of the Bankruptcy Code on May 31, 2001. A creditors' committee was appointed, and PSINet has continued to operate its businesses as a debtor-in-possession.

As in many chapter 11 cases, the Debtor has sought this Court's approval for the sale of whole lines of its business—as, for example, PSINet did with motions seeking approval of the sale of its Panamanian, Canadian, Chilean, and Hong Kong businesses.[1] In the course of PSINet's chapter 11 case and the various requests that the Court consider and approve those sales of PSINet's businesses, the Court has been repeatedly asked to consider and protect the rights of equipment lessors asserting rights in equipment used in those businesses that PSINet sought to convey.[2] Cisco has filed a number of pleadings with respect to the sale approval motions, seeking to protect Cisco's interests in equipment that might be transferred as a part of those sales.[3]

On July 3, 2001, the Debtor PSINet filed the first 11 of the 22 recharacterization

---

1. *See* Docket ## 80, 82, 95 and 186, respectively.

2. *See, e.g.,* Docket ## 151, 153, 282 and 338 (Cisco, with respect to Chilean, Panamanian, Hong Kong and Canadian businesses, respectively); # 215 (General Electric Capital Corporation (GECC), Hong Kong business); # 261 (Finova Capital Corporation, Canadian business); # 309 (NTFC, Canadian business).

Most of the objections that were filed were consensually resolved. A decision with respect to the most vigorously pressed objection, that of equipment lessor NTFC Capital Corporation to the sale of the Canadian business, has been reported. *See In re PSINet, Inc.,* 268 B.R. 358 (Bankr.S.D.N.Y.2001).

3. *See* note 2 above.

adversary proceedings that are, or were, before this Court. On July 20, 2001, the Debtors moved for a stay of any payments that would be due to lessors under Bankruptcy Code section 365(d)(10)—a provision, applicable in chapter 11 cases, that generally requires post-petition payments to lessors under personal property leases after the 60–day point in a chapter 11 case. The Debtors said in that motion:

> By this Motion, the Debtors seek a stay of any payments, pursuant to section 365(d)(10) of the Bankruptcy Code, that would otherwise be due and owing to the counter-parties to the Agreements [the agreements that nominally were leases] (some of which are already subject to the Adversary Proceedings), if the Agreements were true leases pending resolution of the Adversary Proceedings. If this Court determines that the Agreements are indeed secured financings, no payments would be due to the counter-parties to the Agreements pursuant to section 365 of the Bankruptcy Code because section 365 would no longer be applicable; the Debtors would own the equipment and IRUs[4], subject to the potential lien (if perfected) of the respective financier. If this Court rules otherwise, the Debtors will promptly remit all leases payments properly due and owing under the Agreements from July 31, 2001 onward to the counter-parties thereto in accordance with section 365(d)(10) of the Bankruptcy Code.

(Docket # 230 at ¶ 17). They later stated:

> The Debtors have acted, and will proceed to act, in a good faith and timely manner to obtain a judicial determination of the character of the Agreements, and intend to promptly commence similar adversary proceedings against the remaining counter-parties to the Agree-

ments. The Debtors commenced the Adversary Proceedings within 33 days of the Petition Date and will seek resolution of the Adversary Proceedings on as expeditious a timetable as due process and the Court's calendar will allow.

(*Id.* at ¶ 21).

Following the filing of that motion, Cisco separately moved for an order requiring PSINet to make the payments to which Cisco would be entitled under section 365(d)(10) (if the PSINet–Cisco equipment leases were found to be true leases), or, alternatively, for adequate protection payments, under sections 361 and 363 of the Bankruptcy Code (if the leases were found to be financing agreements). (Docket # 384).

For the foregoing reasons, and others, the determination in this adversary proceeding will provide the underpinnings for the determination of numerous contested matters, all arising (and not just related to a case) under title 11:

(a) The Debtor's ability to effect section 363 sales of lines of business (most, or all of which have, in their possession, equipment covered under agreements denominated as leases) has been and will be affected—as evidenced by the Debtor's recent controversy with NTFC in connection with the sale of the Canadian business, and the pleadings with respect to the sale motions filed by Cisco and other equipment lessors in connection with the Chilean, Panamanian, Hong Kong and Canadian businesses sales—by the issue of whether the equipment belongs to the Debtor, on the one hand, or the equipment lessors, on the other;

(b) Two upcoming matters (which the Court now has on its calendar for Janu-

---

**4.** "IRU" refers to indefeasible rights of use, which, by way of a description that may be oversimplified, gives PSINet the right to use certain communication lines.

ary 17) with respect to Cisco's property interests in the equipment:

(1) As to Cisco's right, under Bankruptcy Code section 365(d)(10), to receive monthly payments required under its equipment leases (if they are true leases), and, conversely,

(2) As to Cisco's right, under Bankruptcy Code sections 361 and 363, to "adequate protection" with respect to PSINet's use of equipment which is or may be Cisco's collateral (if the "leases" are in fact secured financing agreements);

(c) The outcome of this proceeding will determine, at least in substantial part, whether or not these nominal equipment leases are executory contracts to be assumed, under section 365(a), and whose defaults must be cured incident to assumption, under section 365(b); and

(d) The outcome will also determine at least some of the issues incident to the determination of the nature and priority of Cisco's claim in this chapter 11 case, and in particular, whether, and to what extent, Cisco has a secured claim.

Here it is undisputed that Cisco has not filed a proof of claim, but, as noted above, Cisco has sought post-petition payments from the Debtor in the underlying chapter 11 case: payment under Bankruptcy Code section 365(d)(10), or, in the alternative, adequate protection payments under sections 361 and 363. On August 31, 2001, Cisco requested the entry of an order requiring PSINet to make monthly payments under its Cisco leases:

1. Cisco requests the entry of an Order by the Court requiring Debtors to make monthly payments of rent under leases between Cisco and Debtors of certain high technology telecommunications equipment. . . .

2. As detailed in pleadings and papers filed in the Debtors' adversary proceeding, Cisco does not believe that Debtors have the legal ability to obtain a court order recharacterizing the leases as secured financing arrangements. However, regardless of whether the leases are deemed to be true leases or secured transactions, Debtors are required to make current monthly payments to Cisco at the contract rate. If the contracts are true leases, Debtors must comply with Section 365(d)(10), which requires Debtors to make current rental payments. If the contracts are deemed to be secured financing arrangements, Debtors are required to provide Cisco with adequate protection of its interests in the collateral. . . .

3. Because Cisco's high-tech equipment is rapidly declining in value at a pace that corresponds with the term of each equipment schedule, monthly payments of the contract rent must be paid to Cisco to adequately protect its interests. . . .

(Docket # 384 at ¶¶ 1–3).

Rather than waiting to raise the matter of recharacterization as a defense or matter of reply in one or more of the contested matters described above, the Debtor sought resolution of the recharacterization issues by bringing preemptive adversary proceedings. Thus, it was at least the predominant purpose of this adversary proceeding to determine matters that are the underpinnings of the above-mentioned determinations that must be made under title 11.

The equipment provided by Cisco has been said by the Debtor to be in the physical possession of PSINet, rather than Cisco, and Cisco has not disputed this. However, PSINet has likewise not disputed that record title to the equipment remains with Cisco, and that the documents

under which PSINet obtained and has possession of the equipment are denominated as leases, presenting the backdrop for this adversary proceeding and the matters that this Court is called upon to decide.

### B.

As required under Local Bankruptcy Rule 7056–1(a), PSINet filed a Statement of Undisputed Facts ("PSINet 7056–1 Statement"). In its response ("Cisco 7056–1 Statement Response"), Cisco did not contest paragraph # 1 and paragraphs # 4 through # 38 of the PSINet 7056–1 Statement—causing them to be deemed admitted, under Local Rule 7056–1(c). But Cisco took issue with some PSINet characterizations and with some statements that may well have been conclusions of law in paragraphs # 2 and # 3—thereby asserting the existence of material disputed issues of fact. However, it appears, on analysis, that the core factual allegations of paragraphs # 2 and # 3 are not disputed; that it is easy for this Court to disregard characterizations; and that the Court can likewise disregard conclusions of law.

Likewise, Cisco filed its own Statement of Undisputed Facts ("Cisco 7056–1 Statement"), with respect to its cross-motion, and because PSINet disputed only Cisco's contentions of law, all of the facts set forth in the Cisco 7056–1 Statement have been deemed admitted.

Based on the facts in those two statements that are deemed admitted (and, in the case of PSINet, the undisputed portion of its paragraphs # 2 and # 3), the Court finds as undisputed facts the following:

Between 1997 and June 2001, PSINet regularly obtained equipment from various vendors for use in its business. PSINet obtained such equipment by entering into agreements, frequently denominated as "leases," with vendors and other third parties.[5]

PSINet obtained some of that equipment from Cisco, and entered into agreements with respect to that equipment under which Cisco retained title to the equipment and leased the equipment to PSINet.[6] Under these agreements, PSINet was required to pay Cisco the full invoiced cost of the equipment, plus a rate of interest agreed to by PSINet and Cisco.[7]

In that connection, PSINet and Cisco entered into a Master Agreement to Lease Equipment on October 10, 1997 (the "Master Agreement"). The equipment would be described in schedules, each of which would incorporate the terms of the Master Agreement and would be a separate contract.[8]

The Master Agreement provides, among other things, that:

> In accordance with the terms and conditions of this Agreement, Lessor [Cisco] shall lease to Lessee [PSINet], and Lessee shall lease from Lessor, the units of

---

5. PSINet 7056–1 Statement at ¶ 1.

6. In accordance with Cisco's response to ¶¶ 2 and 3, generally asking the Court not to accept the characterizations or arguable conclusions of law in the PSINet 7056–1 Statement, the Court has ignored PSINet's characterizations "to finance the purchase of that equipment," "formal" before "title," and quotation marks surrounding PSINet's use of the word "leased."

7. PSINet 7056–1 Statement at ¶ 2. While the Court has accepted Cisco's point that PSINet's characterizations should be rejected and that the Court should not accept PSINet conclusions that are really matters of law, the Court believes that Cisco has made an insufficient showing that this assertion by PSINet is subject to a bona fide material disputed issue of fact.

8. PSINet 7056–1 Statement at ¶ 3.

personal property (individually, a "Unit," and, collectively, the "Equipment") described in the lease schedule(s) (each, a "Lease") to be entered into from time to time into which this Agreement is incorporated.[9]

After executing the Master Agreement, Cisco and PSINet executed 25 lease schedules, between October 24, 1997 and August 21, 2000, bearing the schedule numbers of 1 through 25 (the "Lease Schedules"). Each of the Lease Schedules incorporates the terms of the Master Agreement by reference, and identifies the equipment that was covered by each Lease Schedule.[10]

Each executed Lease Schedule is for a 36–month term, and Section 1.2 of the Master Agreement provides that "[e]xcept as specifically provided in Section 5.14, no Lease [Schedule] may be terminated by Lessor or Lessee, for any reason whatsoever, prior to the end of the [lease term]." Section 5.14 is the only section of the Master Agreement that grants PSINet the right to terminate the lease before the expiration of the 36–month lease term.[11]

Thus each lease can be terminated early by PSINet only if PSINet pays a "buyout payment," as provided by Section 5.14.[12] Under Section 5.14, the amount of the buyout payment was set to be:

> an amount equal to the Casualty Value as of the termination date for all the Equipment ... together any accrued

and unpaid Rent as of the termination date.[13]

If PSINet terminates a Lease Schedule early, the sum of (1) the buyout payment calculated according to the terms specified in Section 5.14 and (2) the present value of the rental payments already made to the lessor would result in PSINet paying the lessor an amount equal to, or in excess of, the full cost of the equipment. This is true regardless of when, in the course of a Lease Schedule's term, the Lease Schedule is terminated. Thus, even if PSINet terminates a Lease Schedule early pursuant to Section 5.14, it must pay Cisco the full cost of the equipment covered by the terminated Lease Schedule.[14] Putting it another way, PSINet cannot avoid paying Cisco the full cost of the equipment covered by each of the Lease Schedules before the term of the Lease Schedule expires.[15]

Pursuant to the Master Agreement and each Lease Schedule, PSINet has the right to purchase the equipment covered by each Lease Schedule for $1 at the expiration of the lease term specified in each of the Lease Schedules.[16]

At the time each Lease Schedule was executed, it was commonly understood that the computer, telecommunication, and internet technology equipment covered by each Lease Schedule had a remaining economic life of less than or equal to 36–months.[17]

---

9. Cisco 7056–1 Statement Response at ¶¶ 2 and 3.

10. PSINet 7056–1 Statement at ¶¶ 4 and 5; Cisco 7056–1 Statement at ¶¶ 3, 5 and 6.

11. PSINet 7056–1 Statement at ¶¶ 7–9.

12. PSINet 7056–1 Statement at ¶ 10.

13. PSINet 7056–1 Statement at ¶ 10.

14. PSINet 7056–1 Statement at ¶ 10.

15. PSINet 7056–1 Statement at ¶ 11.

16. PSINet 7056–1 Statement at ¶ 12.

17. PSINet 7056–1 Statement at ¶ 13. The Court notes that it is not making any finding about the value of the equipment covered by the Master Agreement and the Lease Schedules, and reserves all rights to decide this issue when it is properly before the Court.

The present value of the aggregate rental payments PSINet has made and/or is required to make on each of Lease Schedules 1 through 25 for the equipment covered by such Lease Schedule equals the original cost of the equipment covered by such Lease Schedule.[18]

The Master Agreement specifies that California law is to govern the agreement between the parties.

For its part, Cisco notes that the Master Agreement provides that:

> It is the intent of Lessor, and an inducement to Lessor, to enter into each Lease, to claim all available tax benefits of ownership with respect to the Equipment subject thereto. Lessee acknowledges and represents that (a) no right, title or interest in such Equipment has been or is intended to be passed to Lessee.... [19]

PSINet does not dispute this, though it contends that it is irrelevant.

## I.

### Core Matter?

As a threshold matter, Cisco contends that this adversary proceeding is not a core matter, and that as a consequence, this Court, with a bankruptcy judge deriving his authority under Article I, cannot issue a judgment. Rather, Cisco argues, this Court's power, as an Article I court, is limited to issuing proposed findings of fact and conclusions of law for further consideration by an Article III court district

judge. For the reasons noted below, the Court disagrees.

### A.

The statutory authority determining whether this Court, with an Article I bankruptcy judge (in contradistinction to the district court, with an Article III district judge) can hear and determine this matter for all purposes is the provision of the judicial code, 28 U.S.C., enacted after the Supreme Court's decision in *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982) ("*Marathon*"), 28 U.S.C. § 157. Preliminarily, § 157(a) authorizes the district courts to refer the matters for which district courts have subject matter jurisdiction under 28 U.S.C. § 1334 [20] to the bankruptcy judges of their districts. Then, § 157(b) lays out the power of bankruptcy judges to decide matters after such a reference. The first of § 157(b)'s three subsections, § 157(b)(1), provides that:

> Bankruptcy judges may hear and determine all cases under title 11 and all *core* proceedings arising under title 11, or arising in a case under title 11, referred under subsection (a) of this section, and may enter appropriate orders and judgments, subject to review under section 158 of this title.

(Emphasis added). The second, § 157(b)(2), then provides that "core proceedings include, but are not limited to," 15 enumerated categories of matters.[21]

---

18. PSINet 7056–1 Statement at ¶¶ 14–38.

19. Cisco 7056–1 Statement at ¶ 2.

20. That section, which appears in the judicial code along with its other sections conferring subject matter jurisdiction on the district courts, provides (after providing in its subsection (a) that the district courts have original and exclusive jurisdiction over *cases* under title 11 (Bankruptcy)):

> (b) [T]he district courts shall have original but not exclusive jurisdiction of all civil proceedings *arising under* title 11, or *arising in* or *related to* cases under title 11.
> (Emphasis added).

21. Subsection b(2) provides, in full:

> (2) Core proceedings include, but are not limited to—

Finally, the third of those subsections, § 157(b)(3), provides in relevant part that "[a] determination that a proceeding is not a core proceeding shall not be made solely on the basis that its resolution may be affected by State law." [22]

As the Chief Judge of this Court has noted, requests that a bankruptcy court recharacterize a debtor's obligations under an agreement denominating itself as a lease present "a familiar dispute." *In re*

> (A) matters concerning the administration of the estate;
> (B) allowance or disallowance of claims against the estate or exemptions from property of the estate, and estimation of claims or interests for the purposes of confirming a plan under chapter 11, 12, or 13 of title 11 but not the liquidation or estimation of contingent or unliquidated personal injury tort or wrongful death claims against the estate for purposes of distribution in a case under title 11;
> (C) counterclaims by the estate against persons filing claims against the estate;
> (D) orders in respect to obtaining credit;
> (E) orders to turn over property of the estate;
> (F) proceedings to determine, avoid, or recover preferences;
> (G) motions to terminate, annul, or modify the automatic stay;
> (H) proceedings to determine, avoid, or recover fraudulent conveyances;
> (I) determinations as to the dischargeability of particular debts;
> (J) objections to discharges;
> (K) determinations of the validity, extent, or priority of liens;
> (L) confirmations of plans;
> (M) orders approving the use or lease of property, including the use of cash collateral;
> (N) orders approving the sale of property other than property resulting from claims brought by the estate against persons who have not filed claims against the estate; and
> (O) other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor or the equity security holder relationship, except personal injury tort or wrongful death claims.

*APB Online, Inc.*, 259 B.R. 812, 815 (Bankr.S.D.N.Y.2001) (Bernstein, C.J.). But while proceedings seeking recharacterization of nominal lease arrangements are very common, contentions that such proceedings are non-core are not. Many bankruptcy courts (and in a closely similar case, a district court, in the Southern District of New York) have stated, in the context of considering lease recharacterization issues like those here, that the issues then before them were core.[23] But

**22.** As § 157(c)(1) goes on to provide that in any instance in which the matter is non-core, "the bankruptcy judge shall submit proposed findings of fact and conclusions of law to the district court, and any final order or judgment shall be entered by the district judge after considering the bankruptcy judge's proposed findings and conclusions and after reviewing de novo those matters to which any party has timely and specifically objected," Cisco asks this Court to limit its determination on this motion to making proposed findings and conclusions for the district court's consideration. Since the district court would in any event have the power to review conclusions of law *de novo*, the principal significance of this procedure in recharacterization actions would be with respect to findings of fact—and, of course, delays associated with the need to send such matters up to the district court before final determinations could be made. Where, as here, summary judgment is sought (which is purely a matter of law and thus reviewable on a *de novo* basis anyway), the significance to the parties, and to the administration of justice, would appear to be solely that of delays.

**23.** *See Liona Corp., N.V. v. PCH Associates (In re PCH Associates)*, 60 B.R. 870, 872–873 (S.D.N.Y.) (*"PCH Associates"*) (Tenney, J.) (rejecting lessor contention that matter was non-core in adversary proceeding seeking to recharacterize real estate lease transaction as joint venture, discussed more fully below), *aff'd without discussion of this issue*, 804 F.2d 193 (2d Cir.1986); *Downingtown Industrial & Agricultural School v. Commonwealth of Pennsylvania Dept. of Education (In re Downingtown Industrial & Agricultural School)*, 172 B.R. 813, 820 (Bankr.E.D.Pa.1994) (by implication citing *PCH Associates*); *In re Owen*,

the decisions stating that the matter was core have for the most part done so without extensive discussion, and where recharacterization was raised as a predicate for relief in an adversary proceeding, or as a defense in a contested matter, where relief was sought under title 11, and where the matter would be a core proceeding in any event by reason of the issue under title 11 to be determined.[24] And in other cases where the recharacterization issue was raised as the basis for a claim or defense of a dispute arising under title 11, several courts—perhaps because it was obvious under the facts there presented—

decided the recharacterization issue without expressly stating whether or not the matter was core.[25]

In this case, PSINet raised the recharacterization issue by means of an adversary proceeding for declaratory judgment, instead of dealing with recharacterization as a defense in one or more of the several contested matters under title 11 that would turn on the recharacterization decision's result.[26] While the procedural avenue by which PSINet brought the recharacterization issue before this Court was at least appropriate, and perhaps the better

221 B.R. 56, 58 (Bankr.N.D.N.Y.1998) (Gerling, C.J.); *In re Edison Brothers Stores, Inc.*, 207 B.R. 801, 804 (Bankr.D.Del.1997) (Walsh, C.J.); *In re Integrated Health Services, Inc.*, 260 B.R. 71, 74 (Bankr.D.Del.2001) (Walrath, J.); *EWI, Inc. v. Volvo GM Heavy Truck Corp. (In re EWI, Inc.)*, 1997 WL 811693 (Bankr. N.D.Ohio 1997) (Williams, J.). *But cf. Hassett v. BancOhio Nat'l Bank (In re CIS Corp.)*, 172 B.R. 748 (S.D.N.Y.1994) (*"CIS"*) (Haight, J.) (holding that a different kind of "recharacterization" action—alleging that a sale by which property left estate was not a "true sale"—was non-core, discussed beginning at page 27 below).

24. *See Owen*, 221 B.R. at 58 (considering recharacterization defense in context of lessor motion seeking order requiring the debtors to assume or reject the lease for two trailers, under Bankruptcy Code section 365(d)(2)); *Edison Brothers*, 207 B.R. at 804–805 (considering recharacterization defense in context of motion to compel payments under section 365(d)(10)); *Integrated Health Services*, 260 B.R. at 74 (contested matter, which included a recharacterization defense, was core matter under §§ 157(b)(2)(G) and 157(b)(2)(O); considering recharacterization defense in context of lessor motion seeking, alternatively, relief from automatic stay, adequate protection payments, or order requiring payment of rent under Bankruptcy Code section 365(d)(3)); *EWI*, 1997 WL 811693 at *2 (considering recharacterization claim in context of adversary proceeding seeking, among other things, recovery of preferences and post-petition transfers, and lien avoidance under Bankruptcy Code sections 544, 547, 549 and 550).

25. *See APB Online*, 259 B.R. at 815–816 (considering recharacterization as defense to lessor request for lease payments as administrative claim, presumably under Bankruptcy Code section 503 or section 365(d)(10)); *In re Homeplace Stores, Inc.*, 228 B.R. 88, 90 (Bankr.D.Del.1998) (Walsh, C.J.) (considering recharacterization as defense to lessor motion for payments under Bankruptcy Code section 365(d)(10)); *Hunter v. Snap–On Credit Corp. (In re Fox)*, 229 B.R. 160 (Bankr.N.D.Ohio 1998) (Speer, C.J.) (considering recharacterization issue incident to determination of whether "lease" payments were a preference, under Bankruptcy Code section 547); *In re Eagle Enterprises*, 237 B.R. 269, 274–275 (E.D.Pa.1999) (Waldman, J.) (considering recharacterization, on bankruptcy appeal, in context of debtor-lessee defense to lessor motion to cause ostensible leases to be rejected and to have equipment returned).

26. This is what another debtor in a case before this Court, Ames Department Stores, elected to do, in response to the motions of several equipment lessors for post-petition payments under Bankruptcy Code section 365(d)(10) under nominal leases for "Point of Sale" (POS) computer/cash register equipment. *See In re Ames Department Stores, Inc.*, Case 01–42217(REG), Docket # 382 (Motion of Wells Fargo Equipment Finance, Inc.), # 457 (Motion of Andover Capital Group), # 478 (Motion of GECC), # 542 (Motion of American Finance Group, Inc.), # 548 (Motion of Finova Capital Corp.), and # 550 (Debtor Ames' Response).

way to do it,[27] the bifurcation of the recharacterization issue from the title 11 matters that would turn on the recharacterization result has given rise to the odd circumstance that Cisco now makes an argument that the recharacterization portion is non-core.

However, for the reasons set forth below, this Court is confident that the recharacterization claims before the Court here are no less core than they would be if they had been brought the way they so frequently are, in connection with a litigated dispute (most commonly, a contested matter) under title 11—at least where, as here, the property that is the subject of the dispute is in the lawful possession of the estate, and where the adversary proceeding will set the table for the determination of matters under title 11.[28]

The issue, as this Court believes it can fairly be stated, is this: where a standalone adversary proceeding is brought to determine the interests of the debtor-lessee and its lessor in ostensibly leased property already in the lawful possession of the estate, as a predicate for determining rights of the debtor and its lessor under title 11, is the recharacterization of the debtor-creditor relationship under such circumstances a core matter, within the meaning of § 157(b)? The answer, in this Court's view, is yes.

### B.

The Court starts with the words of the statute. Under § 157(b)(2), core matters include, but are not limited to—

(A) matters concerning the administration of the estate;

(B) allowance or disallowance of claims against the estate . . .;

. . . .

(K) determinations of the validity, extent, or priority of liens;

. . . .

(N) orders approving the sale of property other than property resulting from claims brought by the estate against persons who have not filed claims against the estate; and

(O) other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor or the equity security holder relationship, except personal injury tort or wrongful death claims.

28 U.S.C. § 157(b)(2).

Each of the above categories can fairly be said to cover, in one way or another, the recharacterization adversary proceeding brought here, at least if the recharacterization action's purpose—providing the basis for further determinations under title 11—can be considered. And since the adversary proceeding is an exercise in the construction of UCC § 1–201(37) (the definition of a "security interest"), subsections

---

**27.** Fed. R. Bankr.P. 7001, which sets out those matters which require an adversary proceeding, includes among them, with exceptions not relevant here, proceedings to "determine the validity, priority, or extent of a lien or other interest in property," Rule 7001(2); "a proceedings to obtain an injunction or other equitable relief," Rule 7001(7); and proceedings "to obtain a declaratory judgment relating to any of the foregoing." Rule 7001(9). Thus it is appears that determining the recharacterization issue by adversary proceeding, under Fed. R. Bankr.P. 7001

*et seq.,* and not just by contested matter, under Fed. R. Bankr.P. 9014, was at least appropriate, if not essential.

**28.** *See also,* in this connection, the discussion in Section I(D)(1) below, and, in particular, the fact that adversary proceedings were introduced in 1973 with the understanding that they would neither extend nor limit the jurisdiction the bankruptcy court otherwise would have.

"(K)" (determinations of the validity, extent, or priority of liens) [29] and "(O)" (insofar as it covers adjustment of the debtor-creditor relationship) fairly can be said to cover the recharacterization action here even apart from its underlying purpose.

But because caselaw warns us of excessively broad readings of the above-quoted language that would make the definition of core matters all-encompassing—particularly with respect to categories "(A)" (matters concerning the administration of the estate) and "(O)"—review of the underlying caselaw is necessary to confirm that usage in a particular manner is consistent with the principles underlying the determination of what matters are core.[30] Similarly, since § 157(b)(2) expressly provides that core matters *are not limited to* the enumerated matters and the caselaw has recognized this,[31] and because the caselaw has substantially fleshed out the rationale of § 157(b), review of the caselaw is necessary to determine whether the recharacterization adversary proceeding here should be regarded as core, even if it does not fit within one of the 15 enumerated categories.

Attempts to construe the language of § 157(b)(2) properly begin with *Marathon* and its Supreme Court progeny. In *Marathon,* a majority of the Supreme Court

---

**29.** The Court is not persuaded, in this regard, by Cisco's argument that this proceeding does not involve matters under subsection (K) because the "Debtor's complaint takes no position on Cisco's liens, indeed the Opposition reserves the right to argue such matters in future proceedings" (Cisco's Reply Brief in Support of its Motion for Summary Judgment ("Cisco Reply #1") at 8–9)—implying that this would be a core matter under subsection (K) only if the plaintiff were also trying to attack Cisco's liens. Determining the "extent" of a lien (one of the three types of lien-related matters explicitly mentioned in § 157(b)(2)(K)) necessarily includes determining whether one exists at all. And attacks of the type discussed by Cisco would more appropriately be described as attacks on the "validity" of Cisco's liens—another of the lien-related matters listed under subsection (K). The issue of whether, under UCC § 1–201(37), Cisco has a security interest (i.e., a "lien") is just as much covered under subsection (K), in this Court's view, as second- and third-step inquiries with respect to whether such lien was duly perfected or is avoidable.

**30.** *See Ben Cooper, Inc. v. The Insurance Co. of the State of Pennsylvania (In re Ben Cooper, Inc.),* 896 F.2d 1394 (2d Cir.) (*"Ben Cooper "*), vacated and remanded, 498 U.S. 964, 111 S.Ct. 425, 112 L.Ed.2d 408 (1990), *reinstated on remand,* 924 F.2d 36 (2d Cir.), *cert. denied,* 500 U.S. 928, 111 S.Ct. 2041, 114 L.Ed.2d 126 (1991) (The language of § 157(b)(2)(A) "could be construed to include almost any matter relating to bankruptcy, but the structure of the statute as a whole does not permit such a construction"; the court attempts to make the general language of § 157(a)(2)(A) more concrete); *Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.),* 4 F.3d 1095, 1102 (2d Cir.1993) (*"Orion "*) (finding to be overly broad an interpretation of "administration of the estate" that would find contract actions to be core under that subsection because collection of amounts claimed would inure to the benefit of the estate); *Resolution Trust Corp. v. Best Products Co. (In re Best Products Co.),* 68 F.3d 26, 31 (2d Cir.1995) (*"Best Products "*) (citing *Ben Cooper* for the proposition that some of the categories are so broad as "to include almost any matter relating to bankruptcy", and recognizing that "such an open-ended limitless construction would be incorrect"; rather, a determination of whether a matter is core would depend on the nature of the proceeding). *But see* the further discussion in *Best Products,* 68 F.3d at 32 (stating that in its earlier decision in *Orion,* the Second Circuit had merely said that allowing that § 157(b)(2)(A) to encompass *"any "* breach of contract action that would inure to the benefit of the estate would create an exception that would swallow the rule—and there finding the enforcement of a subordination agreement to be a core matter under § 157(b)(2)(A)).

**31.** *See, e.g., Ben Cooper,* 896 F.2d at 1398 ("In § 157(b)(2), Congress provided a *non-exclusive* list of proceedings which it deemed core") (emphasis added).

concluded that an Article I judge, lacking Article III status, could not constitutionally decide the debtor's plenary suit for damages for breach of a pre-petition contract that was there before the court. However, no majority subscribed to a single view.

As the First Circuit described the *Marathon* issues and holding in *Arnold Print Works, Inc. v. Apkin (In re Arnold Print Works, Inc.)*, 815 F.2d 165, 166 (1st Cir. 1987) ("*Arnold Print Works*"),[32] the Supreme Court considered whether the bankruptcy court possessed the constitutional power to adjudicate a debtor's state law contract suit for damages, where its claim arose before the filing of the debtor's bankruptcy petition. *See Arnold Print Works*, 815 F.2d at 166. A plurality of four justices in *Marathon*, after reasoning that bankruptcy courts were not Article III courts, "reviewed the three 'exception[s] from the general prescription of Art. III'—exceptions that, historically speaking, have been limited to congressional creation of 'territorial courts,' 'courts martial,' and 'legislative courts and administrative agencies' that 'adjudicate cases involving 'public rights.' '" *Arnold Print Works*, 815 F.2d at 166, (citing *Marathon*, 458 U.S. at 64–67, 102 S.Ct. 2858). The *Marathon* plurality characterized "public rights" as those that "arise 'between the government and others,' " as contrasted with "private rights," which involve "the liability of one individual to another under the law as defined." *Id.*,

815 F.2d at 166 (quoting *Marathon*, 458 U.S. at 69–70, 102 S.Ct. 2858). However, in an observation highly relevant to bankruptcy cases, the First Circuit observed that the *Marathon* plurality "conceded that Congress might grant to non-Article III courts the power to find facts in cases involving *certain* private rights, namely congressionally created private rights." *Id.* (quoting *Marathon*, 458 U.S. at 80, 102 S.Ct. 2858: "[W]hen Congress creates a substantive federal right, it possesses substantial discretion to prescribe the manner in which that right may be adjudicated—including the assignment to an adjunct of some functions historically performed by judges").

But since the right contested in *Marathon* was neither a "public right" nor a "congressionally created right," the *Arnold Print Works* court noted, the plurality in *Marathon* said Congress could not delegate the power to adjudicate that right to an Article I bankruptcy court. *Id.* The *Arnold Print Works* court characterized the concurrence of two other justices in *Marathon* with the plurality's result as on the narrower ground that the issues in *Marathon* arose "entirely under state law," and that no case had "gone so far" as to permit a non-Article III court to adjudicate a claim like the one there. *See id.* (quoting *Marathon*, 458 U.S. at 90–91, 102 S.Ct. 2858 (Rehnquist, C.J., concurring in the judgment)).[33]

The *Arnold Print Works* court went on to say that "[t]he Supreme Court has since

---

**32.** The analysis of the First Circuit in *Arnold Print Works*, in an opinion authored by then Judge, now Supreme Court Justice, Breyer, has frequently been cited by the Second Circuit and other courts in analysis of *Marathon* and its Supreme Court progeny. *See, e.g., Ben Cooper*, 896 F.2d at 1399; *Best Products*, 68 F.3d at 31.

**33.** Significantly, however, even the plurality in *Marathon* distinguished "the restructuring of debtor-creditor relations, which is at the

*core* of federal bankruptcy power," from the "adjudication of state created private rights." *See Marathon*, 458 U.S. at 71 102 S.Ct. 2858 (Brennan, J., for the plurality) (emphasis added). The plurality likewise considered it appropriate for bankruptcy judges to decide "the manner in which the rights of debtors and creditors are adjusted." *Id.* at 84, n. 36, 102 S.Ct. 2858. These points were noted by Justice White in his dissent. *Id.* at 95, 102 S.Ct. 2858 (White, J., dissenting). Though that was not relevant to the judgment in *Mar-*

adopted a view of *Marathon* that resembles that of the concurring justices." *Id.* at 166. The First Circuit noted the Supreme Court's subsequent decision in *Thomas v. Union Carbide Agricultural Products Co.*, 473 U.S. 568, 105 S.Ct. 3325, 87 L.Ed.2d 409 (1985), wherein the Supreme Court characterized *Marathon* as a case in which the Supreme Court "was unable to agree on the precise scope and nature of Article III's limitations." *Id.* (citing *Thomas*, 473 U.S. at 584, 105 S.Ct. 3325). The *Arnold Print Works* court quoted *Thomas* as stating that:

> The court's holding in [*Marathon*] establishes *only* that Congress may not vest in a non-Article III court the power to adjudicate, render final judgment, and issue binding orders in a traditional contract action arising under state law, without consent of the litigants, and subject only to ordinary appellate review.[34]

*Id.* at 166 (emphasis added) (quoting *Thomas*, 473 U.S. at 584, 105 S.Ct. 3325).[35]

This "narrow view of the decision," *see Arnold Print Works*, 815 F.2d at 166, was in substance reaffirmed by the Supreme Court in *Commodity Futures Trading Commission v. Schor*, 478 U.S. 833, 839,

106 S.Ct. 3245, 92 L.Ed.2d 675 (1986) (quoting most of the same statement from *Thomas* that the First Circuit had—but without saying, as did the *Thomas* court, that the holding in *Marathon* established "only" that much).

The Second Circuit's view of *Marathon* was laid out in *Ben Cooper*, one of Second Circuit's several decisions involving core and non-core matters:

> The Supreme Court held that while Congress, pursuant to its power under the Bankruptcy Clause of the Constitution, U.S. Const., art I, § 8, cl. 4, could grant the bankruptcy courts the right to issue final orders in proceedings that were at the core of bankruptcy jurisdiction, primarily the restructuring of the debtor-creditor relationship, it could not give the right to issue such orders in "private right" claims (e.g., tort and contract), merely because those claims involved a debtor. *Marathon, supra*, 458 U.S. at 71, 102 S.Ct. at 2871. Those traditional common law claims, the Court held, were reserved for Article III courts.

*Ben Cooper*, 896 F.2d at 1398.

As noted at the outset, Congress enacted legislation after *Marathon* to cure the

---

*athon*, it is, for the reasons below, relevant here.

**34.** *See also Thomas*, 473 U.S. at 599, 105 S.Ct. 3325 (Justice Brennan, the author of the *Marathon* plurality opinion, concurring in judgment: in *Marathon*, "[w]e recognized that a bankruptcy adjudication, though technically a dispute among private parties, may well be properly characterized as a matter of public rights").

**35.** To the same effect, Chief Justice Burger, dissenting in *Marathon*, had noted:

> I join Justice WHITE's dissenting opinion, but I write separately to emphasize that, notwithstanding the plurality opinion, the Court does *not* hold today that Congress' broad grant of jurisdiction to the new bankruptcy courts is generally inconsistent with Art. III of the Constitution. Rather, the

Court's holding is limited to the proposition stated by Justice REHNQUIST in his concurrence in the judgment—that a "traditional" state common-law action, not made subject to a federal rule of decision, *and related only peripherally to an adjudication of bankruptcy under federal law*, must, absent the consent of the litigants, be heard by an "Art. III court" if it is to be heard by any court or agency of the United States. This limited holding, of course, does not suggest that there is something inherently unconstitutional about the new bankruptcy courts; *nor does it preclude such courts from adjudicating all but a relatively narrow category of claims "arising under" or "arising in or related to cases under"* the [1978] Bankruptcy Act.

*Marathon*, 458 U.S. at 92, 102 S.Ct. 2858 (Burger, C.J., dissenting) (emphasis in *"not"* in original; remainder of emphasis added).

constitutional defect in its earlier bankruptcy-related provisions in 28 U.S.C. that the *Marathon* court had found. *See Arnold Print Works*, 815 F.2d at 166–167. The new jurisdictional provisions distinguished between "core" bankruptcy proceedings and those that were merely "related to" title 11 cases. Representative Kastenmeier, one of the amendment's cosponsors, explained that core proceedings are "integral to the core bankruptcy function of restructuring debtor-creditor rights," and include "all necessary aspects of a bankruptcy case." *Id.* at 167 (quoting 130 Cong. Rec. E1109 (daily ed. March 20, 1984)). Non-core proceedings, by contrast, were "*Marathon*-type suits," by which they meant claims "concerned only with State law issues that did not arise in the core bankruptcy function of adjusting debtor-creditor rights." *Id.* at 167.

With both the caselaw and legislative history to guide it, the First Circuit, in *Arnold Print Works*, held that in the matter before it—a suit by the estate on a breach of a *post*-petition contract—was core, even though it was a suit for breach of contract under state law. The First Circuit held first that the contract in question was covered under at least two of the subsections of § 157(b)(2), and then held that deeming the matter to be core was constitutionally permissible. In connection with the first holding, the First Circuit noted the legislative intent of § 157 that " 'core proceedings' would be interpreted broadly, close to or congruent with constitutional limits," and that jurisdiction in core bankruptcy proceedings would be "broader than the summary jurisdiction under pre–1978 law."[36] *Id.* at 168. And providing assistance to any court analyzing § 157(b)'s scope, the First Circuit recognized that the authors of § 157(b) also spoke of core proceedings as those "integral to the core bankruptcy function of *restructuring debtor-creditor rights,*" *id.* at 169 (emphasis in original), and that "this last italicized phrase was not meant to restrict core proceedings to competing claims directly against the estate," but rather "referred generally to all proceedings that are '*non-Marathon*' bankruptcy matters." *Id.* (emphasis in original).

Finally, the First Circuit noted that Congress had "specifically provided that the 'determination that a proceeding is not a core proceeding shall not be made solely on the basis that its resolution may be affected by State law.' " *Id.* at 169. Rather, the First Circuit stated that:

> It is the nature of the proceeding—its relation to the basic function of the bankruptcy court—not the state or federal basis for the claim, that makes the difference here.

*Id.*

The Second Circuit has issued several major decisions addressing the scope of core proceedings, and in only one of them—a variant of a *Marathon*-type action—has the Second Circuit found a matter to be non-core. The first two were decided on the same day, *Gulf States Exploration Co. v. Manville Forest Products Corp. (In re Manville Forest Products Corp.)*, 896 F.2d 1384 (2d Cir.1990) ("*Manville Forest Products* "), and *Ben Cooper*.

In *Manville Forest Products*, the Second Circuit affirmed a decision of the district court that held that an adversary proceeding was a core proceeding when the adversary proceeding related to the bankruptcy court's determination of the breach of contract issues underlying a

---

**36.** For a discussion of summary jurisdiction under pre–1978 law, which plainly also would be present here, *see* Section I(D) below.

debtor's objection to a $16 million proof of claim filed by Gulf States Exploration Company.[37] In *Ben Cooper,* the Second Circuit reversed a decision of the district court that held an adversary proceeding to be non-core when it involved a suit by the debtor on a contract that had been entered into post-petition, as in *Arnold Print Works.* In finding such a proceeding to be a core matter, the *Ben Cooper* court quoted extensively from *Arnold Print Works,* and held consistently. In particular, the Second Circuit endorsed the First Circuit's analysis in *Arnold Print Works* of the legislative history of § 157 in the respect that "bankruptcy jurisdiction was to be construed as broadly as possible within the constitutional constraints of *Marathon,*" *Ben Cooper,* 896 F.2d at 1398; the Second Circuit also noted, as had the First Circuit, that "the sponsors repeatedly said that 95 percent of the proceedings brought before bankruptcy judges would be core proceedings." *Id.* And like the First Circuit in *Arnold Print Works,* the Second Circuit in *Ben Cooper* noted the express language of § 157 provides "that '[a] determination that a proceeding is not a core proceeding shall not be made solely on the basis that its resolution may be affected by State law.'" *Id.* at 1399. In that connection, the Second Circuit continued:

> We read that as a demonstration of Congress' intent that bankruptcy courts are not precluded from adjudicating state-law claims when such claims are at the heart of the administration of the bankruptcy estate.

*Id.*

The next major Second Circuit case determining whether a matter before it was core was its 1993 decision in *Orion, see* note 30 above—a case considering a close cousin of a *Marathon*-type case. In *Orion,* the debtor Orion had entered into a film distribution contract with the cable network Showtime (generally requiring Showtime to license all films distributed by Orion, without regard to their commercial success) that contained a key-man clause requiring Orion's continued employment of certain executives who had left Orion's employ. Showtime had sent letters to Orion asserting that with the departure of certain executives, Orion was out of compliance with the agreement's key-man clause, and Showtime would no longer accept Orion films—a position that Orion contended constituted an anticipatory breach of the parties' contract.

In the bankruptcy court, Orion had initiated two separate matters. First, Orion sought to assume the distribution contract under Bankruptcy Code section 365. Second, and apart from its assumption motion (which, when opposed, became a contested matter), Orion brought a separate breach of contract adversary proceeding against Showtime, alleging that Showtime was guilty of anticipatory breach. In the adversary proceeding, Orion sought an order permitting it to assume the agreement, declaratory relief setting forth the parties' rights and obligations, and specific performance of Showtime's obligations to make payments under the contract, or alternatively, $77 million in damages for breach of contract. Orion later amended its complaint to drop its claims for specific performance and damages, leaving only a request for assumption of the contract and a prayer for declaratory relief. *Orion,* 4

---

37. The Second Circuit said, in that connection:

[W]e hold that the instant adversary proceeding, which involves the determination of a proof of claim filed in the bankruptcy case, is clearly at the core of the federal bankruptcy function of restructuring debtor-creditor rights, implicating the unique powers of bankruptcy courts.

*Manville Forest Products,* 896 F.2d at 1390.

F.3d at 1098. A motion to withdraw the reference of the adversary proceeding was denied by the district court, which held that the adversary proceeding was a core proceeding. *Id.* at 1097.

The bankruptcy court had considered the anticipatory breach issue in ruling on the section 365 assumption contested matter, and after concluding that Orion was not in breach of the key-man clause, permitted Orion to assume the contract; the bankruptcy court then dismissed the anticipatory breach adversary proceeding as moot. The bankruptcy court's decision was affirmed by the district court, but was reversed by the Second Circuit. The latter ruled that it was error for the bankruptcy court to decide a disputed factual issue between the parties to a contract in the context of determining whether the debtor should be permitted to assume the contract. *See id.* at 1098–1099. The Second Circuit also ruled that the decision by the district court declining to withdraw the reference with respect to the adversary proceeding was infected by an erroneous analysis as to whether it was core. *Id.* at 1102 ("While the district court in the case at bar appropriately first focused its attention on whether the Adversary Proceeding was core or non-core, its erroneous conclusion that it was core infected the rest of its analysis"). The Second Circuit stated, in the latter connection:

> While it is clear that Congress intended § 157(b)(2)(A)'s designation of matters relating to the administration of the estate as core to encompass a wide range of matters, there is no evidence of any Congressional intent to contravene the Supreme Court's holding in *Marathon* .... Thus we hold that this breach-of-contract action by a debtor against a party to a pre-petition contract. who has filed no claim with the bankruptcy court, is non-core.
>
> *Id.*

However, in each of next three major decisions in this area, the Second Circuit once more found the issues before it to be core. In the first of them, *S.G. Phillips Constructors, Inc. v. City of Burlington (In re S.G. Phillips Constructors, Inc.)*, 45 F.3d 702 (2d Cir.1995) ("*S.G.Phillips*"), the Second Circuit easily found the determination of the breach of contract claim of the claimant, City of Burlington, Vermont, to be core, when the city had filed a proof of claim in the debtor's bankruptcy case, albeit as a "defensive" measure. Although the dispute involved an alleged breach of contract governed solely by state law, it was in the context of the claims allowance process, to which § 157(b)(2)(B), which makes matters involving the allowance of claims against the estate a core matter, plainly applied. As important, deeming it to be a core matter was held not to be inconsistent with *Marathon*.

In the second of them, *Best Products*, Chief Judge Brozman of the bankruptcy court had confirmed a plan of reorganization that, as one of its elements, enforced a subordination agreement as between the debtor's secured creditors. The district court affirmed in a decision by Judge Schwartz. *Resolution Trust Corp. v. Best Products Co., Inc. (In re Best Products Co., Inc.)*, 177 B.R. 791 (S.D.N.Y.1995).

The Resolution Trust Corp. ("RTC"), whose predecessor had entered into a subordination agreement subordinating its claim to Chemical Bank and other secured creditors, contended that the bankruptcy court lacked the power to enforce the subordination agreement—characterizing it as "merely a contract dispute between two creditors," *Best Products*, 68 F.3d at 28, which was a non-core matter under *Marathon*. However, the Second Circuit reject-

ed the RTC's argument, and affirmed the decisions by Judges Brozman and Schwartz to enforce the subordination provisions.

After starting with a discussion of *Marathon* and Congress' legislative response to it, which codified the core/non-core distinction, the Second Circuit in *Best Products* noted that "[t]his court has concluded that the *Marathon* holding was a narrow one and has broadly construed the jurisdictional grant in the 1984 amendments." *Id.* at 31 (citing *S.G. Phillips* and *Ben Cooper*). It went on to recognize that settlement of the dispute before the bankruptcy court was "essential to the administration of the estate": [38]

> A cause of action based on this provision is markedly different from traditional "*Marathon*-type" non-core matters. Fixing the order of priority of creditor claims against a debtor is an integral and historic bankruptcy function, and without this power the bankruptcy court would be rendered powerless to rehabilitate a debtor. While enforcing subordination agreements is not listed as a core proceeding, the power to prioritize distributions has long been recognized as an essential element of bankruptcy law.

*Id.* at 31. And the Second Circuit endorsed the analysis of Judge Brozman in the Bankruptcy Court below, stating that she "correctly noted":

> [I]t is hard to imagine an issue that is more at the heart of the bankruptcy process than is this. Enforcement of a contractual subordination agreement clearly involves the adjustment of the debtor-creditor relationship, determinations of the priority of liens, and administration of the estate and so falls within

the ambit of 28 U.S.C. § 157(b)(2)(A), (K), and (O).

*Id.* at 31 (quoting *In re Best Products Co., Inc.,* 168 B.R. 35, 66–67 (Bankr.S.D.N.Y. 1994) (Brozman, C.J.)).

Though the competing claimants in *Best Products* had filed proofs of claim against the debtor, *id.* at 31, the Second Circuit did not rely on this, as it had in *S.G. Phillips.* Rather, it noted that:

> [S]ince we have determined that enforcement of that [subordination] agreement in the context here presented is itself a core proceeding, reliance upon the filing of a proof of claim is unnecessary to establish jurisdiction.

*Id.* at 32.

Significantly for our purposes, the Second Circuit in *Best Products* distinguished *Orion,* both with respect to language in that decision and its bottom line holding. The Second Circuit rejected an argument by the RTC that the "catch-all" provisions of § 157(b)(2)—referring to § 157(b)(2)(A) and perhaps § 157(b)(2)(O)—had to be read narrowly. The *Best Products* court noted that:

> "[I]t is clear that Congress intended 157(b)(2)(A)'s designation of matters relating to the administration of the estate as core to encompass a wide range of matters . . . ." *Id.* at 1102. We merely found [in the earlier caselaw] that allowing that subsection to encompass "*[a]ny* [breach of] contract action that the debtor would pursue . . . [and that] would be expected to enure to the benefit of the debtor estate" would create an exception to *Marathon* that would swallow the rule.

---

**38.** *Best Products,* 68 F.3d at 31 (citing to § 157(b)(2)(A), and Bankruptcy Code section 510(a), which provides, in substance, that subordination provisions are enforceable in bankruptcy to the same extent as in nonbankruptcy law, but does not provide for a substantive remedy, or jurisdiction, to enforce them).

*Id.* at 32 (quoting *Orion*) (emphasis in original).

Thus this Court reads that language in *Best Products* as reaffirming the breadth of § 157(b)(2)(A)—and by implication, § 157(b)(2)(O)—and simply cautioning practitioners and the lower courts that such breadth is not a substitute for appropriate legal analysis in determining whether a matter is properly core, and determining whether a given matter passes muster under standards such as whether the matter at hand is "an integral and historic bankruptcy function," or goes to the "heart" of the bankruptcy process.

The *Best Products* court also distinguished *Orion* on its facts. *Orion*, it held, was a *Marathon*-type action. The Second Circuit went on to say, with respect to *Orion:*

> The only relationship the action had to the bankruptcy proceeding was that determination of the action would affect the ultimate size of the estate. Unlike a proceeding that simply seeks to augment the estate, the present proceeding involves the priority rights of creditors who have filed claims against the estate.

*Id.* at 32.[39]

And the third major Second Circuit case, *United States Lines, Inc. v. American Steamship Owners Mutual Protection and Indemnity Ass'n, (In re United States Lines, Inc.)*, 197 F.3d 631 (2d Cir.1999) ("*U.S.Lines*"), once more found the issues before it to be core. There the reorganized debtor, United States Lines, and its

Reorganization Trust, brought an adversary proceeding seeking a declaratory judgment to establish the Trust's rights under various insurance contracts, all of which had been entered into pre-petition. Although the bankruptcy court had held that the action was core, the district court had found to the contrary, and reversed. But the district court had certified its order under 28 U.S.C. § 1292(b), and upon review of the question, the Second Circuit reversed the district court, and once more held the proceeding to be core.

The contracts were Protection & Indemnity insurance policies ("P & I policies") which covered asbestos injuries sustained by employees of United States Lines, who had filed more than 18,000 claims. The proceeds of the P & I policies were the only funds potentially available to cover the employees' personal injury claims. At the heart of each of those policies was a "pay-first" provision under which the insurers' liability was not triggered until the insured paid the claim of the personal injury victim. It was important for the estate's ability to reorganize to determine whether creative means to satisfy the "pay-first" obligation without expending large sums that the estate did not have would meet the requirements of the policies.

Though the individual members of the panel, Circuit Judges Walker, Newman and Calabresi, did not then determine whether a suit alleging a post-petition breach of a contract was or was not *necessarily* a core proceeding,[40] they neverthe-

---

**39.** As is apparent from the quoted language and language preceding it, the Second Circuit also noted that in *Best Products* the competing creditors had in fact filed claims against the estate. But it is apparent from the Second Circuit's later discussion, *see* pages 19–20 above, that these were two independent grounds for finding the matter to be core.

**40.** *See U.S. Lines*, 197 F.3d at 638 and n. 1 (Judge Walker expressing the view that a suit on a post-petition breach of a pre-petition contract would not necessarily be core, but noting that this was his individual view), *id.* at 641 and n. 1 (Judge Newman expressing the view that such a suit should be treated as core, and noting that Judge Calabresi did not reach the issue).

less joined in an analysis relevant here, and, at least impliedly, in the view that the matter then before the Second Circuit should not be deemed to be a *Marathon*-type lawsuit. In *U.S. Lines*, the debtor was seeking a declaratory judgment with respect to the construction of a pre-petition contract. In an analysis highly relevant here, the Second Circuit (without dissent in this regard from either of the concurring judges) [41] held:

> Notwithstanding that the Trust's claims are upon pre-petition contracts, we conclude that the *impact* these contracts have on *other* core bankruptcy functions nevertheless render the proceedings core.

*U.S. Lines*, 197 F.3d at 638 (emphasis added). The court recognized that the debtor's indemnity insurance contracts could well be the most important asset of the debtor's estate. *Id.* And it continued:

> As such, resolving disputes relating to major insurance contracts are bound to have a significant impact on the administration of the estate.

*Id.*

The Second Circuit then contrasted *Orion*, "where the insurance proceeds would only augment the assets of the estate for general distribution." *Id.* While that kind of effect on the administration of the estate was insufficient to render the proceedings core, *id.* (citing *Orion*, 4 F.3d at 1102), "[r]esolving the disputes over the P & I policies here *has a much more direct impact on the core administrative functions of the bankruptcy court.*" *Id.* (emphasis added).

Putting it in more specific terms, and discussing the purpose and effect of the declaratory judgment adversary proceed-

ing that the debtor had brought, the *U.S. Lines* court explained:

> Therefore, in order to effectuate an equitable distribution of the bankruptcy estate, a comprehensive declaratory judgment is required to determine (1) whether a chosen payment plan will trigger the indemnification obligation and (2) the amounts payable under the insurance contracts. Thus, the declaratory proceedings brought by the Trust in this case *directly affect the bankruptcy court's core administrative function of asset allocation among creditors,* and for that reason they are core.

*Id.* at 639 (emphasis added).

Significantly, the Second Circuit did not say that the declaratory judgment adversary proceeding *itself* was an administrative function; it was core because it "*directly affect[ed]*" a bankruptcy court's "core administrative function." *Id.* (emphasis added).

### C.

So far as this Court can discern (and the parties' briefing has revealed), neither the Second Circuit, nor any other court of appeals, has ruled on whether a stand-alone adversary proceeding for lease recharacterization—with or without important characteristics present here, recharacterization of rights concerning leased property in the lawful possession of the estate, and for the purpose of determining rights in upcoming contested matters under the Bankruptcy Code—is a core matter. But there is district court authority (and in the Southern District of New York) closely on point. *See PCH Associates*, at note 23 above. There Judge Tenney, on an appeal from a decision of Chief

---

41. Judge Walker's statement with respect to the portion of his opinion that represented his individual views, *see* note 40 above, was limited to the preceding paragraph. *See U.S. Lines*, 197 F.3d at 638 n. 1.

Judge Lifland in a recharacterization adversary proceeding in the bankruptcy court, rejected an argument that the adversary proceeding was non-core.

In *PCH Associates,* the debtor-lessee had brought an adversary proceeding to obtain a declaratory judgment as to the nature of a real estate sale and leaseback agreement, seeking to recharacterize it as a joint venture. In the underlying bankruptcy case, the lessor had applied for an order directing the debtor to pay rent. Judge Lifland had ruled in the debtor-lessee's favor in the adversary proceeding, having treated it as a core matter, and having concluded that as the agreement in question was in reality a joint venture agreement, the debtor was not required to pay rent. *See PCH Associates v. Liona Corporation N.V. (In re PCH Associates),* 55 B.R. 273 (Bankr.S.D.N.Y.1985) (Lifland, C.J.) (*"PCH Bankruptcy Court Decision"*), *aff'd* 60 B.R. 870 (S.D.N.Y.) (Tenney, J.), *aff'd* 804 F.2d 193 (2d Cir.1986).

In addition to challenging Judge Lifland's decision on the merits, the appellant-lessor argued before Judge Tenney that the adversary proceeding was non-core, and thus subject to *de novo* review by the district court. *See PCH,* 60 B.R. at 872. Judge Tenney rejected the argument. He found, in essence, that where the adversary proceeding provided the means for the determination of whether a true lease existed so that the determination could be used in connection with the allowance of claims against the estate and duties under section 365, the recharacterization issues in the adversary proceeding were core matters. In doing so, Judge Tenney stated:

Core proceedings are statutorily defined as including actions for the "allowance or disallowance of claims against the estate." 28 U.S.C. § 157(b)(2)(A). In this instance Liona asserted a claim for rent against the estate. As previously noted, Liona asked the bankruptcy court to direct PCH to perform its obligations under the Ground Lease as required by Code §§ 365(d)(3) and (4). In order to determine PCH's obligations, the court *first had to determine* whether, in fact, a true lease existed for the purposes of Code § 365. Since the case at bar involves a claim against the estate and the claim arose under the Code, it is clear that this case is a core proceeding and must be reviewed as such.

*PCH Associates,* 60 B.R. at 872–873 (emphasis added).

That analysis informs the determination here, especially when one analyzes the context in which Judge Tenney made the observations. As here, the federal questions forming the backdrop to the adversary proceeding—requests for rent under section 365(d)(3) and decisions as to the time to assume or reject under 365(d)(4)—were not in the adversary proceeding, but in the underlying bankruptcy case. And as here, the issue before Judge Tenney was whether the matters in the separate adversary proceeding were core or non-core. He found the matters in the adversary proceeding to be core because "[i]n order to determine PCH's obligations [in the underlying case], the court *first had to determine* [in the adversary proceeding] whether, in fact, a true lease existed for the purposes of Code § 365." *Id.* (emphasis added). That was so even though the underlying issues considered in the adversary proceeding were solely based on state law.[42] Though *PCH Associates* was decid-

---

**42.** *See PCH Associates,* 60 B.R. at 873 n. 5 ("The law of Pennsylvania governs in this case"); *PCH Bankruptcy Court Decision,* 55 B.R. at 279 (identifying as issue whether Pennsylvania or New York law governs the construction of the agreements); *id.* at 274–

ed long before *U.S. Lines*,[43] it reflects the same type of analysis—determining the matter to be core because it was a necessary prerequisite to dealing with undisputedly core matters.

■ *PCH Associates* stands as precedent for determining that a stand-alone adversary proceeding is core when it provides the underpinnings for the determination of separate contested matter core issues, and it can be fairly read for the proposition that when one considers whether an adversary proceeding raises core issues, it is appropriate to consider the reasons why the adversary proceeding was brought, and to see if its purpose or effect is a step to the determination of core matters.[44]

Cisco argues in its reply brief that although *PCH Associates* "included a recharacterization element," it is "irrelevant to the present action," because in *PCH Associates* it was deemed to be core since "it concerned a claim filed against the estate by a creditor."[45] But that description, while accurate in a sense, fails to tell the whole story. Neither Judge Lifland, in the bankruptcy court below, nor Judge Tenney, in the district court, took the position that the matter was a core matter because the lessor Liona had filed a *proof of claim*. Rather, each did so because Liona had sought post-petition payments under its lease—there, since the leased property was non-residential real estate, under Bankruptcy Code section 365(d)(3)—thereby necessitating a determination as to whether it was a true lease. Cisco fails sufficiently to take into account (1) that Judge Tenney did not base his *PCH Associates* decision on a consent to treatment as a core matter (or some other kind of submission to treatment of all related disputes as a core matter) that might be deemed to have resulted solely as a consequence of the filing of a proof of claim;[46] and (2) that Judge Tenney was ruling on whether the issues in the *separate adversary proceeding* were core, rather than the related section 365 contested matters, when the "claim" filed against the estate—a 365(d)(3) post-petition payment request—was brought not in the adversary proceeding, but in the underlying bankruptcy case.

Here it is undisputed that Cisco has not filed a proof of claim, but, like the lessor in *PCH Associates*, Cisco has sought post-petition payments from the Debtor in PSINet's underlying chapter 11 case: payment under section 365(d)(10), or, in the alternative, adequate protection payments under sections 361 and 363. As noted above in the Court's discussion of the facts, Cisco wrote:

> 1. Cisco requests the entry of an Order by the Court requiring Debtors to make monthly payments of rent under leases

---

284 (reflecting the total absence of consideration of any federal question).

**43.** Indeed, *PCH Associates* was decided before all of the Second Circuit cases discussed above, and even *Arnold Print Works*, the First Circuit decision which was an important underpinning to the Second Circuit doctrine in this area.

**44.** Likewise, this Court does not find *PCH Associates* distinguishable because of a potential argument that by filing a claim in *PCH Associates*, the lease counter-party had submitted itself to the jurisdiction of the bankruptcy court. As noted in this Court's discussion of *Best Products*, *see* pages 18 to 20 above, the need to form a predicate for determination of other core issues and a creditor's filing of a proof of claim provided *separate* bases for concluding that the issue before the court was a core matter.

**45.** Cisco Reply Brief # 1 at 8.

**46.** *See, e.g., Katchen v. Landy*, discussed at note 59 below.

between Cisco and Debtors of certain high technology telecommunications equipment. . . .

2. As detailed in pleadings and papers filed in the Debtors' adversary proceeding, Cisco does not believe that Debtors have the legal ability to obtain a court order recharacterizing the leases as secured financing arrangements. However, regardless of whether the leases are deemed to be true leases or secured transactions, Debtors are required to make current monthly payments to Cisco at the contract rate. If the contracts are true leases, Debtors must comply with Section 365(d)(10), which requires Debtors to make current rental payments. If the contracts are deemed to be secured financing arrangements, Debtors are required to provide Cisco with adequate protection of its interests in the collateral. . . .

3. Because Cisco's high-tech equipment is rapidly declining in value at a pace that corresponds with the term of each equipment schedule, monthly payments of the contract rent must be paid to Cisco to adequately protect its interests. . . .

(Docket # 384, ¶¶ 1–3).

This submission was filed by Cisco after PSINet filed its complaint in this adversary proceeding, but before the determination of this summary judgment motion. The Court considers the submission significant not because it constitutes a consent to the treatment of the adversary proceeding as a core matter or the waiver of Cisco's ability to contend that the adversary proceeding is non-core, but rather because it shows (a) the close connection between the subject matter of the adversary proceeding and the title 11 issues in the underlying case, and (b) the similarity of this case to *PCH Associates*, in terms of the "claims" asserted by the lessor. Thus this Court finds *PCH Associates* persuasive in suggesting that the recharacterization action here is, in fact, core.

Judge Tenney's decision in *PCH Associates* was affirmed by the Second Circuit, but without discussion of his holding that the adversary proceeding appealed from involved core matters.[47] While under those circumstances, it is inappropriate to regard *PCH Associates* as a Second Circuit pronouncement as to the issue presented here, the Second Circuit decisions discussed above are least consistent with, and indeed, compel, the view that the lease recharacterization matter here is core. Likewise, holding the lease recharacterization issue here to be core is not at all inconsistent with *Marathon*.

Turning to the latter first, *Marathon* has been construed in subsequent Supreme Court decisions, as noted above, in accordance with the views of Justice Rehnquist, concurring in the judgment. But the lease recharacterization adversary proceeding here is not a suit for damages on a pre-petition contract, of the type that Justice Rehnquist noted had traditionally been heard only by Article III courts. It cannot fairly be called, in this Court's view, a *"Marathon*-type" action. Even more clearly, it cannot fairly be called, using Justice Burger's words, a " 'traditional' state common-law action,"[48] for what is

47. *See PCH Associates*, 804 F.2d at 196 (identifying issues then before the Second Circuit), *aff'g* 60 B.R. 870 (S.D.N.Y.1986), *aff'g* 55 B.R. 273 (Bankr.S.D.N.Y.1985). On appeal, the Second Circuit affirmed for somewhat different reasons than the courts below; while the Second Circuit agreed that the agreement that was the subject of the adversary proceeding was not a true lease, the Second Circuit determined that it did not need to, and did not, reach the issue of what the agreement was.

48. *See* note 35, page 15 above.

"traditional" about an action like this one is only that it was routinely determined by bankruptcy referees and bankruptcy judges under the Bankruptcy Act.[49]

 Then, turning to the Second Circuit caselaw, the Court believes that holding this matter to be core is not only consistent with the Second Circuit decisions; it is compelled by the Second Circuit's decisions in *Best Products* and, particularly, *U.S. Lines*. It has been the law of the Second Circuit (if not also elsewhere) at least since *Ben Cooper* that (1) bankruptcy jurisdiction is to be construed as broadly as possible within the constitutional constraints of *Marathon, see Ben Cooper*, 896 F.2d at 1398; (2) a determination as to whether or not a proceeding is core is not to be made solely on the basis that its resolution may be affected by state law, *id.* at 1399; and (3) bankruptcy courts are authorized to adjudicate state law claims that are at "the heart of the administration" of the bankruptcy estate. *Id.* at 1399. While the first two principles are only mildly helpful in making the determination as to whether a given matter is core, and are hardly determinative, the third principle is of great importance. In a case like this one, where nominally leased equipment is used in the debtor's business to a great extent, both qualitatively and quantitatively, and issues concerning the rights associated with that equipment come up over and over again, it is easy to conclude, and this Court does conclude, that determining the economic reality of nominal lease transactions—to the end that PSINet may own, rather than merely lease, the equipment in its possession, and for all of the purposes noted above [50]—is, as much or more so than the subordination agreements determinations in *Best Products,* a classic example of the

"adjustment of the debtor-creditor relationship," and goes to the "heart" of the administration, and reorganization, of the PSINet estate.

That conclusion strongly follows from the Second Circuit's decisions in *U.S. Lines* and *Best Products.* In *U.S. Lines,* as here, the Second Circuit had to determine whether an adversary proceeding involving a pre-petition contract was core. As here, the adversary proceeding was for a declaratory judgment, and not, as in *Marathon,* an action to recover damages. As here, the underlying adversary proceeding in *U.S. Lines* was governed by state law, and as here, its result would determine other matters critical to the underlying chapter 11 case. In *U.S. Lines,* the fact that, if one looked at the law underlying the adversary proceeding, it would involve construction of pre-petition contracts under state law, was not determinative. Rather, the Second Circuit looked at the declaratory judgment action the U.S. Lines Trust brought to determine the underlying purpose and effect of the adversary proceeding in the context of the bankruptcy case—was it to augment the assets, of the estate, on the one hand, or to achieve judicial determinations essential for the administration of the estate, on the other? It is necessary and appropriate for this Court to engage in a similar analysis, and after doing so, this Court has no doubt that this matter is likewise core.

*Best Products,* while not as dramatically applicable, also leads this Court to find the matter here to be core. *Best Products,* it will be recalled, found the enforcement of prepetition subordination agreements to be core. The Second Circuit ruled that:

Fixing the order of priority of creditor claims against a debtor is an integral

---

49. *See* Section I(D), page 31 below.

50. *See* pages 5 to 6 above.

and historic bankruptcy function, and without this power the bankruptcy court would be rendered powerless to rehabilitate a debtor. While enforcing subordination agreements is not listed as a core proceeding, the power to prioritize distributions has long been recognized as an essential element of bankruptcy law. *Best Products,* 68 F.3d at 31. While recharacterizing a nominal lease of property where the debtor is lessee—what Judge Bernstein referred to as "a familiar dispute"—is likewise not expressly mentioned in § 157(b)(2) as a core matter, it is also an integral and historic bankruptcy function, one which also has long been regarded as an essential element of bankruptcy law.[51] And just as the Second Circuit endorsed Judge Brozman's view that it was "hard to imagine an issue that is more at the heart of the bankruptcy process" than the enforcement of the subordination provisions there, *see id.* at 32 (quoting *Best Products,* 168 B.R. at 66–67), this Court believes that given the purpose and effect of the lease recharacterization issue here, it is no less at the heart of the bankruptcy process as clearly "involv[ing] the adjustment of the debtor-creditor relationship, determinations of the priority of liens, and administration of the estate." *Id.* (quoting *Best Products,* 168 B.R. at 66–67).

Thus, *Best Products* and *U.S. Lines,* fairly read, support the view that even a stand-alone adversary proceeding involving the enforcement or construction of a pre-petition contract can be core if it does not seek recovery of damages for the pre-petition breach of that contract, and either

is "unique to or uniquely affected by" the bankruptcy case, or the adversary proceeding "directly affect[s] a core bankruptcy function." The former requirement is met because in the absence of bankruptcy, this recharacterization proceeding would have neither purpose nor effect; in the absence of bankruptcy, the obligations under the leases would remain the same, and a decision as to the leases' recharacterization is required only to meet bankruptcy needs. And the latter requirement is met because, as repeatedly noted above, at least five analytically separate issues under title 11 will turn on its result, and none of them could be determined without making, in one way or another, the determination PSINet asks this Court to make here.

Cisco understandably tries to raise *Orion* as compelling a conclusion that the matters here are non-core, but this Court believes that *Orion* is distinguishable here for the same reasons that the Second Circuit distinguished *Orion* in *U.S. Lines.* In *Orion,* as the *U.S. Lines* court noted, the Second Circuit concluded that where the insurance proceeds would only *augment* the assets of the estate for general distribution, the effect on the administration of the estate was insufficient to render the proceedings core. *See U.S. Lines,* 197 F.3d at 638. The Second Circuit contrasted the facts in *Orion* to those with respect to the declaratory judgment sought in *U.S. Lines* in a manner equally applicable here. It noted that "[r]esolving the disputes over the P & I policies here has a much more direct impact on the core administrative functions of the bankruptcy court." *Id.*

---

51. *See, e.g., In re Telemax Corp.,* 10 UCC Rep. Serv. 1316, 1971 WL 17981 (Bankr.S.D.N.Y. 1971). There then-Referee Babbit considering a lease recharacterization issue identical in substance to the one here, years before the enactment of the Bankruptcy Code, noted:
> Basically the overall controversy is a familiar one in bankruptcy proceedings involving

as it does the question of whether what appears to be an equipment lease between parties in effect creates security interests which require perfection by filing under the Uniform Commercial Code in order to withstand the challenge of a trustee in bankruptcy.

Holding this proceeding to be core would not, as in *Orion*, "create[ ] an exception to *Marathon* that would swallow the rule." *See Orion*, 4 F.3d at 1102.

Cisco places substantial reliance on another decision of the district court, Judge Haight's decision in *CIS*. While sharing a susceptibility to description as a "recharacterization" action, *CIS* involved a different kind of "recharacterization." In *CIS*, the debtor, the original lessor of computer equipment that had been leased to third parties, had sold the equipment, and assigned its lessor interest in that equipment, to the defendant BancOhio. With that sale, BancOhio became entitled to receive, and did receive, the stream of receivables associated with the equipment, i.e., the quarterly lease payments. *See CIS*, 172 B.R. at 752. After the filing of a petition under the Bankruptcy Code, the debtor's chapter 11 trustee brought an adversary proceeding against BancOhio, alleging, in substance, that the sale of the equipment to BancOhio had not been a "true sale," and instead was a financing transaction, as a result of which BancOhio was merely the lender and not the owner of the leased equipment.

In his decision in *CIS*, issued before *Best Products* and *U.S. Lines*, Judge Haight ruled that the proceeding before him was non-core. He first rejected an argument that PSINet has *not* made here—that the estate's invocation of Bankruptcy Code section 105(a) would provide a basis to assert that the matter before him arose under title 11. *Id.* at 757. He then rejected arguments with some similarity to those PSINet has made here—that the adversary proceeding was core because it was a partial response to a motion by BancOhio under section 365 of the Bankruptcy Code, and that it was a proceeding under §§ 157(b)(2)(O) and 157(b)(2)(A), re-

spectively, with respect to the liquidation of the assets of the estate or the adjustment of the debtor-creditor relationship, or with respect to the administration of the estate.

With respect to the former points, Judge Haight ruled that to use §§ 157(b)(2)(O) and 157(b)(2)(A) as the *CIS* trustee had argued would "be to allow this amorphous provision to emasculate *Marathon*." *Id.* at 757. He noted the rejection by the *Orion* court of efforts to use § 157(b)(2)(A) under the theory that augmentation of the estate would facilitate its administration. *Id.* And he likewise rejected the argument that the recharacterization action was core because it involved determination of the validity of a lease in the context of a motion by BancOhio under section 365. In this regard, he stated:

> It is inaccurate to suggest that the adversary proceeding requires a determination of the validity of the leases. The fundamental underlying issue in the adversary proceeding is whether the estate is entitled to ownership of the leased property, not whether the Leases are valid. Nothing in BancOhio's request for an order compelling the Trustee to compel or reject certain Remarketing Agreements is inconsistent with its asserted position of ownership of the property. Moreover, the adversary proceeding simply cannot be considered a response to the narrow questions presented by BancOhio's § 365 motion.

*Id.* at 757–758.

While PSINet argues that *CIS* was wrongly decided, this Court believes that such is not at all clear, and that this Court might well have come out the same way, particularly in the light of the caselaw as it was in 1994.[52] But this Court does believe

---

52. For example, as noted above and below, *CIS* preceded the Second Circuit's decisions

the facts of *CIS* are, in any event, distinguishable in material respects from the facts in the PSINet case here. Also, the law that has come down from the Second Circuit since *CIS* was decided would affect at least some of the language used in that decision, whether or not it would change the underlying result.

First, and most significant, here the Debtor has possession of the property whose ownership is in controversy, and in *CIS* the debtor did not. That distinction, which would affect whether the bankruptcy court had summary jurisdiction to decide the controversy under pre-Code law, is of critical importance in determining whether determination of the dispute could be deemed to be a core matter. This is of such importance that it is discussed separately in Section I(D) below.

Second, when the *CIS* title 11 issues were carefully parsed, as Judge Haight did, it was apparent in *CIS* that the adversary proceeding there really had nothing to do with issues under title 11. Any executory contract relationships there present— the type that might require determinations under Bankruptcy Code section 365 if a debtor were a party to them—were between BancOhio and the underlying equipment lessees, not CIS or its trustee. Thus, while Judge Haight understandably discounted them as a factor in *CIS*, the executory contract issues here are materially different—where, as previously noted, PSINet is presently, and without dispute, a party to each of the equipment leases in question here, and where PSINet has the need, in the numerous respects described above, to secure the judicial determination it has sought in this adversary proceeding to lay the predicate for the many issues that turn on the determination under title 11.

Third, under the facts as found by Judge Haight, *CIS* was, like *Orion*, simply a case to augment the estate—to capture equipment that, at least nominally, had been sold outright to BancOhio, and in which the debtor, CIS, no longer had any interest, until and unless the CIS trustee convinced a court to rule differently.

Finally, when *CIS* was decided, neither *Best Products* nor *U.S. Lines* had yet been decided, and Judge Haight did not have the benefit of the Second Circuit's clarification in those cases of language used in the earlier Second Circuit rulings. For instance, while *Ben Cooper*, which Judge Haight quoted, had indeed warned litigants of the dangers of excessive reliance on § 157(b)(2)(A), as use of that provision might swallow the *Marathon* decision, in *Best Products*, as noted above, the Second Circuit made clear that the earlier language to that effect in *Ben Cooper* and *Orion* had meant merely to refer to the impropriety of use of § 157(b)(2)(A) as a kind of wild card—to reject the argument that § 157(b)(2)(A) would cover " '*[a]ny* ' [breach of] contract action that the debtor would pursue" and that might enure to the benefit of the estate. *See Best Products*, 68 F.3d at 32 (emphasis in original). After the later decision in *Best Products* came down, it became clear that the Second Circuit did not foreclose use of § 157(b)(2)(A) in an appropriate case. *U.S. Lines*, published in 1999, and which found the insurance policy declaratory judgment actions to be core under § 157(b)(2)(A), was of course a classic implementation of that distinction.

Cisco's other express or implied points warrant lesser mention. The truism that the rule of decision in this controversy comes from state law is not, in this Court's

in *Best Products* and *U.S. Lines,* both of which would affect any determination as to appro-

priate use of § 157(b)(2)(A) and, impliedly, § 157(b)(2)(O).

view, determinative. As previously noted, § 157(b)(3) expressly provides that a decision as to existence or non-existence of core jurisdiction shall not be made solely on the basis that its resolution may be affected by state law, and numerous decisions of, and in, the Second Circuit, *e.g. Manville Forest Products, Ben Cooper, Orion,* and even *CIS* (upon which Cisco relies), make that clear.

■ Likewise, the fact that a recharacterization matter like this one could be heard outside of bankruptcy is not a basis, at least in the Second Circuit, for finding the matter to be non-core. While there is authority in other circuits that would support this argument, *see In re Wood,* 825 F.2d 90, 97 (5th Cir.1987) ("If the proceeding does not invoke a substantive right created by the federal bankruptcy law and is one that could exist outside of bankruptcy it is not a core proceeding"); *Torkelsen v. Maggio (In re Guild and Gallery Plus, Inc.),* 72 F.3d 1171, 1176 (3d Cir.1996) (citing *Wood*), the *Wood* test with respect to this not only has never been applied by the Second Circuit; it has been expressly rejected by the Second Circuit. *See Ben Cooper,* 896 F.2d at 1400 ("We hold that the timing of a dispute may render it uniquely a bankruptcy case. To the extent that *Wood* conflicts with our holding, we decline to follow it"). Likewise, the Second Circuit did not follow *Wood,* at least to the extent of applying that very rigid test, in *Manville Forest Products.*[53] *U.S. Lines* is the most obvious example of the Second Circuit's rejection of the *Wood* notion; the declaratory judgment actions found to be core in *U.S. Lines* could easily have been brought in state court, and the substantive rights determined there could easily have been determined out of bankruptcy.

Second Circuit authority is binding on this Court, and the Second Circuit is also right. As Justice White noted in his dissent in *Marathon* (in comments with which neither the *Marathon* plurality nor the justices concurring with the result differed), "the bankruptcy judge is constantly enmeshed in state-law issues." *Marathon,* 458 U.S. at 97, 102 S.Ct. 2858 (White, J., dissenting); *see also Butner v. United States,* 440 U.S. 48, 55, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979) (in the absence of overriding federal interest, matters as to property rights—as to both ownership and se-

---

**53.** In *Manville Forest Products,* decided the same day as *Ben Cooper,* wherein the Second Circuit found the allowance process with respect to a state law breach of contract action to be core, the Second Circuit did not likewise expressly decline to follow *Wood,* but it was required to, and did, stretch *Wood* beyond the language used by the *Wood* court to take into account *Wood's* overly narrow formulation:

> "The filing of the proof invokes the special rules of bankruptcy concerning objections to the claim, estimation of the claim for allowance purposes, and the rights of the claimant to vote on the proposed distribution. *Understood in this sense, a claim filed against the estate is a core proceeding because it could arise only in the context of bankruptcy.* Of course, the state-law right underlying the claim could be enforced in a state court proceeding absent the bankruptcy, but the nature· of the state proceeding

would be different from the nature of the proceeding following the filing of a proof of claim."

896 F.2d at 1389–1390 (emphasis in original). This Court prefers, as did the Second Circuit in *Ben Cooper* (and, at least in result, in *Manville Forest Products, Best Products* and especially, *U.S. Lines* ), to simply decline to follow *Wood,* but if this Court were to construe *Wood* as the *Manville Forest Products* court did, *Wood* could not be applied to a fact situation like that here. As in the $16 million breach of contract situation discussed in *Manville Forest Products,* the recharacterization under the UCC sought here could be achieved in a state court proceeding absent the bankruptcy, "but the nature of the state proceeding would be different from the nature of [the bankruptcy court] proceeding[s] *following* the filing of [the adversary complaint]." *See id.* at 1390 (emphasis added).

curity interests—in federal bankruptcy courts are determined by state law). The fact that an issue could have been determined in state court is not controlling, nor should it be.[54] Rather, the issue, for purposes of analysis, is in what context, and for what purpose, are the state law issues—even if they could have been determined in a state court—being decided? The First Circuit in *Arnold Print Works*, see above pages 13 to 16, stated that it is the nature of the proceedings—its relation to the function of the bankruptcy court—not the state or federal basis for the claim, that is determinative, see 815 F.2d at 169. The Second Circuit, as evidenced in *Ben Cooper, Best Products, and U.S. Lines*, has analyzed the issues the same way.

Cisco then argues the truism that suits seeking to augment the estate, like those in *Orion* and *CIS*, have repeatedly been held to be non-core, and seeks to characterize this case as such. But this Court does not regard this declaratory judgment case as an "augmentation" case any more than this Court (or the Second Circuit) might regard the declaratory judgment actions against the insurance companies in *U.S. Lines* to be such. In each of this case and *U.S. Lines*, the practical effect of the declaratory judgment litigation, depending on the outcome and/or other circumstances, might well be an economic or reorganization benefit for the estate involved; that is why, presumably, each estate sought the declaratory judgment it did. But the fact that the *U.S. Lines* estate would benefit (presumably economically, as well as in its reorganization) from a declaratory judgment permitting it to secure the benefits of its insurance policies without actually having to expend huge

amounts of funds under the "pay first" provisions did not disqualify it from having its case determined to be a core matter, when the purpose and effect of the declaratory judgment action was to facilitate the reorganization effort and classic title 11 matters. Significantly, the Second Circuit in *U.S. Lines* did not rule that the declaratory judgment actions the U.S. Lines Trust brought would not have *any* augmentation effect; it ruled, rather, that resolving disputes with respect to the insurance contracts in question was "bound to have a significant impact on the administration of the estate," 197 F.3d at 638, and that, relative to the adversary proceeding in *Orion*, where the recovery would "*only* augment" the assets of the estate, *id.* (emphasis added), the declaratory judgment adversary proceeding in *U.S. Lines* would "ha[ve] a much more direct impact on the core administrative functions of the bankruptcy court." *Id.* That is equally true here.

This Court is unpersuaded by the "augmentation" argument for another reason as well. Cisco bases its augmentation argument on the truism that if PSINet prevailed, the recharacterization as sought by PSINet would make the nominally leased equipment property of the estate and not Cisco. But unless the total economic reality is taken into account, that is more a play on words than anything else. Cisco also fails to take into account that the liability associated with the full value of the equipment will not go away, and that if any such equipment, as a consequence of recharacterization, were deemed to be PSINet property, the equipment would be held subject to that associated liability with a security interest in Cisco's favor to back it up—and that the PSINet estate

---

54. In fact, § 157(b)(3), providing that the determination of whether or not a matter is core shall not be made solely on the basis that its

resolution may be affected by state law, is difficult to reconcile with the *Wood* notion.

would have the same possessory right that it now has, and be liable for the same debt to Cisco that it now has.[55] Undoubtedly, *other creditors* could be advantaged if it were also determined down the road that Cisco failed to perfect its security interests—or that (by reason of perfection during the Bankruptcy Code's avoidance period, or some other reason) validly perfected liens were subject to avoidance—and Cisco had only an unsecured claim against the PSINet estate. But if that were to occur (and it may be that to even assume this as a possibility is inappropriate speculation), it would be as a consequence of bankruptcy policy long pre-dating the Bankruptcy Code; it would not be as a consequence of the augmentation of the estate, but rather of the basic bankruptcy policy that the rights of a secured creditor—rights with priority over unsecured creditors—arise only when the secured creditor's security interest is duly perfected and unavoidable.

Cisco points out another truism that if § 157(b)(2)(A), matters involving the administration of the estate, were construed coextensively with the potential scope of that expression, that would be proving too much, and that the provision cannot be construed that way.[56] This is true, but the appropriate remedy is simply to apply § 157(b)(2)(A) with care, and not to say that it can never be used in an appropriate case. As discussed above, the Second Circuit made clear in *Best Products*, decided after the early cases upon which Cisco relies, that the earlier Second Circuit holdings did not mean that section 157(b)(2)(A)

could *never* be applicable in the context of an adversary proceeding involving the interpretation or enforcement of a pre-petition contract. Rather, they held only that § 157(b)(2)(A) could not be used as a basis for saying that *"any"* contract action was appropriately a core action, as a matter involving the administration of the estate, when that action might bring in money for the estate. *Best Products* made clear that the Second Circuit did not foreclose the use of § 157(b)(2)(A) in a case with appropriate facts, and in each of *Best Products* and *U.S. Lines* the matters then before the Second Circuit were held to be core under § 157(b)(2)(A).

### D.

The Court is also of the view that this matter should not be regarded as a *"Marathon*-type" action by reason of two matters apparent from review of the pre-Code law and practice under the former Bankruptcy Act—(1) where, as here, property in question was in the physical possession of the estate, the matter of recharacterization of rights associated with it was a matter which bankruptcy referees, and then bankruptcy judges, could consider in the exercise of their summary jurisdiction under the former Act,[57] and (2) consideration of such recharacterization matters was a common practice under the former Act. Thus, unlike the determination of the traditional contract action for damages that was before the court in *Marathon*, a bankruptcy court's determination of a re-

---

**55.** Also, by definition, if the Lease Schedules were determined to be financing agreements rather than "true leases," the equipment would have zero value at the time the present possessory right ended, with the Debtor having then already paid for the equipment in full.

**56.** The Court assumes that Cisco makes a like argument with respect to § 157(b)(2)(O),

which similarly has great breadth, and could be said also to have the potential for abuse.

**57.** *See Torkelsen v. Maggio (In re Guild & Gallery Plus),* 72 F.3d 1171, 1176 (3d Cir. 1996) ("Under appropriate circumstances, we may look to cases decided under the 1898 Act for guidance in determining whether a matter is a core proceeding").

characterization matter like this one would reflect no change from the pre-Code law.

(1)

Under the former Bankruptcy Act (the "Act"), the jurisdiction of the bankruptcy court was generally limited to matters as to which the bankruptcy court had "summary jurisdiction." *See* Benjamin Weintraub & Alan N. Resnick, *Bankruptcy Law Manual*, ¶ 6.01 at page 6.3 (4th ed. 1996) (*"Weintraub & Resnick"*). If the bankruptcy court lacked summary jurisdiction, any claims on behalf of the trustee or the estate would have to be brought in a separate plenary action in a state or federal court. Summary jurisdiction extended to property that was in the actual or constructive possession of the bankruptcy court on the day the bankruptcy petition was filed. *See Weidhorn v. Levy*, 253 U.S. 268, 271–272, 40 S.Ct. 534, 64 L.Ed. 898 (1920) ("[I]f the property were in the possession of the bankruptcy court or its officer, any controversy raised by an adverse claimant setting up a title to or a lien upon it might be determined on summary proceedings in the bankruptcy court, and would fall within the jurisdiction of the referee");[58] *see also Bitker v. Whyte,*

*Hirschboeck, Minahan, Harding & Harland (In re Land Investors, Inc.)*, 544 F.2d 925, 929 (7th Cir.1976) ("It is 'elementary bankruptcy law' that ... summary jurisdiction exists as to all property in the actual or constructive possession of the court on the date the petition is filed") (internal citations omitted).

The "actual or constructive possession of the court" resulted from the possession of the bankrupt on the date of the bankruptcy filing. *See, e.g., Pressler v. Haab (In re Alliance Beverage Co., Inc.)*, 420 F.Supp. 437, 440 (N.D.Ind.1976). With exceptions not relevant here,[59] bankruptcy courts could exercise jurisdiction only to the extent that they had summary jurisdiction.

Under the Act, if the bankruptcy court had summary jurisdiction, it could then utilize powers given to it under the Act to decide matters. The Act provided, in relevant part:

> The courts of the United States hereinbefore defined as courts of bankruptcy are hereby created courts of bankruptcy and are hereby invested ... with such jurisdiction at law and in equity as will enable them to exercise original jurisdic-

---

**58.** Conversely, *Weidhorn* held that a fraudulent conveyance by the bankrupt, more than four months prior to the bankruptcy, could be set aside only in a plenary suit when the property was in the actual possession of the transferee under an adverse claim of ownership and not in the custody of the court. *Weidhorn*, 253 U.S. at 272, 40 S.Ct. 534.

**59.** *E.g.*, in cases under Chapter XI of the former Act (from which, along with Chapters X and XII of the former Act, chapter 11 of the present Code evolved), § 311 applied. It provided:

> Where not inconsistent with the provisions of this chapter [XI], the court in which the petition is filed shall, for the purposes of this chapter, have exclusive jurisdiction of the debtor and his property, wherever located.

As the court noted in *In re U.S. Financial Incorporated*, 1 Bankr.Ct. Dec. (CRR) 542 (Bankr.S.D.Cal.1974):

> Such jurisdiction [under § 311] is dependent upon the particular property being in the possession of the debtor, either actual or constructive, or by the debtor holding title to the property on the date of the filing of the petition.

Jurisdiction based on the debtor's title, of course, has no relevance here.

Also, under the Act the bankruptcy court could exercise summary jurisdiction based on the consent of a party, including as a consequence of a party's filing of a proof of claim. *See Katchen v. Landy*, 382 U.S. 323, 86 S.Ct. 467, 15 L.Ed.2d 391 (1966) (filing of proof of claim constituted consent to the summary jurisdiction of the bankruptcy court when the trustee sought to recover a voidable preference).

tion in proceedings under this Act ... to—

....

 (7) Cause the estates of bankrupts to be collected, reduced to money, and distributed, *and determine controversies in relation thereto*, except as herein otherwise provided ...

Bankruptcy Act § 2a; *see* 1 Lawrence P.King, *Collier on Bankruptcy* (14th ed. 1974) ("*Collier 14th* ")[60] at pages 131 and 133 (quoting § 2 as it then read) (emphasis added).[61] With respect to proceedings under former Act § 2a(7), *Collier 14th* provided:

> When the property has become subject to the jurisdiction of the bankruptcy court as that of the bankrupt, whether held by him or for him, jurisdiction exists to determine the controversies in relation to the disposition of the same *and the extent and character of liens thereon or rights therein.* If the property or fund is in the possession of the court, represented by one of its officers, such as the receiver or trustee, *controversies in respect thereto are clearly within its jurisdiction.*

**60.** This 14th edition is the earlier edition of *Collier on Bankruptcy*, which discussed the law under the former Act, as contrasted to the present 15th Edition, which, along with a discussion of former law by way of background, discusses the present Code.

**61.** Implementing a change made in 1952 to legislatively overrule the Supreme Court's decision in *Cline v. Kaplan*, 323 U.S. 97, 65 S.Ct. 155, 89 L.Ed. 97 (1944) (which had held that a respondent would not be deemed to have consented if it made formal objection to the exercise of summary jurisdiction at *any* time, even if just before the entry of the final order in the proceeding), *see* 1 *Collier 14th* ¶ 2.01[3] at page 143, Act § 2a(7) went on to provide that:

> [W]here in a controversy arising in a proceeding under this Act an adverse party *does not interpose objection to the summary*

*Id.* ¶ 2.46 at pages 276–278 (emphasis added).

*See also Thompson v. Magnolia Petroleum Co.*, 309 U.S. 478, 481, 60 S.Ct. 628, 84 L.Ed. 876 (1940) (the possession by the trustee in railroad reorganization under former Act § 77, who had physical possession of right-of-way lands used by his railroad, was an adequate basis for the bankruptcy court's exercise of summary jurisdiction to determine title to fee, and hence to oil reserves underlying the property). The Supreme Court there noted:

> Bankruptcy courts have summary jurisdiction to adjudicate controversies relating to property over which they have actual or constructive possession. And the test of this jurisdiction is not title in but possession by the bankrupt at the time of the filing of the petition in bankruptcy.

*Id.* at 481, 60 S.Ct. 628.

This principle had its origin not in any specific statutory provision in the former Act, but rather in the historic *in rem* nature of bankruptcy. In his dissent in *Marathon*, Justice White discussed some of that history.[62] After noting that the

> *jurisdiction of the court of bankruptcy*, by answer or motion filed before the expiration of the time prescribed by law or rule of court or fixed or extended by order of court for the filing of an answer to the petition, motion or other pleading to which he is adverse, he shall be deemed to have consented to such jurisdiction ...

*Id.* at page 133. It is noteworthy that "summary jurisdiction" was not itself defined in the former Act, nor did the former Act have any actual provision setting forth summary jurisdiction as a source or basis of jurisdiction. Rather, it was in substance an underlying requirement for jurisdiction, and basis for it, that was not codified by statute.

**62.** This Court has limited its reliance on Justice White's discussion of the law in this regard to matters as to which it believes that neither the *Marathon* plurality, nor the jus-

great bulk of creditor claims accrued under state law prior to bankruptcy,[63] Justice White stated:

> The new aspect of the Bankruptcy Act of 1978, in this regard, therefore, is not the extension of federal jurisdiction to state law claims, but its extension to particular kinds of state-law claims, such as contract cases against third parties or disputes involving property *in the possession of a third person.* Prior to 1978, a claim of a bankrupt against a third party, such as the claim against Marathon in this case, was not within the jurisdiction of the bankruptcy judge. The old limits were based, of course, on the restrictions implicit within the concept of *in rem* jurisdiction; the new extension is based on the concept of *in personam* jurisdiction.

*Marathon,* 458 U.S. at 97, 102 S.Ct. 2858 (italics in *"in rem"* and *"in personam"* in original; remainder of emphasis added):

Underscoring the difference between the matter here and the type of matter with which the *Marathon* court was presented, Justice White quoted from the legislative history of the new Code. Under the new Code, in contrast to the former Act:

> "The bankruptcy court is given in personam jurisdiction as well as in rem jurisdiction to handle everything that arises in a bankruptcy cases." H.R.Rep. No. 95–595, p. 445 (1977), U.S.Code Cong. & Admin.News 1978, p. 6400. The difference between the new and old Acts, therefore, is not to be found in a

distinction between state-law and federal-law matters; rather, it is in a distinction between *in rem* and *in personam* jurisdiction.

*Id.* Justice White went on to argue that the *Marathon* majority had failed to explain why the *in rem-in personam* distinction should have constitutional implications. Whether or not he was right in this regard, however, is irrelevant here because it underscores how it is that where the bankruptcy court would have *in rem* jurisdiction, the new Code was effecting no change from the prior law, and matters of that type were not of the kind that had troubled the *Marathon* majority.

When the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") were first enacted in 1973, and thereby created the "adversary proceeding," the drafters made clear that the Bankruptcy Rules were not intended to expand the bankruptcy court's jurisdiction. *See* 1 *Collier 14th* ¶ 2.01[7] at pages 144.1–144.2; former Bankruptcy Rule 928 ("These rules shall not be construed to extend or limit the jurisdiction of courts of bankruptcy over subject matter").[64] The Introductory Note to the Preliminary Draft of the proposed Rules submitted to the Bench and Bar on March 31, 1971, further made that clear:

> These proposed rules are intended to prescribe the *procedure* for handling the *controversies embraced within the court's jurisdiction* as well as all the phases of administration not involving a controversy. The proposed rules are

---

tices who concurred with the plurality in result, would have quarreled. Certainly the other two opinions are devoid of any such indication.

**63.** Justice White noted:

> The existence and validity of such claims recurringly depend on state law. Hence, the bankruptcy judge is constantly enmeshed in state-law issues.

*Marathon,* 458 U.S. at 97, 102 S.Ct. 2858 (White, J., dissenting).

**64.** The modern rule is to the same effect, though more inclusive:

> These rules shall not be construed to extend or limit the jurisdiction of the courts or the venue of any matters therein.

Fed. R. Bankr.P. 9030.

not intended to apply in what are denominated plenary proceedings or actions that are brought in federal district courts and state courts.

1 *Collier 14th* ¶ 2.01[7] at page 144.1 (emphasis added).

Thus it is clear that when the mechanism of the adversary proceeding was created, and implemented through Part VII of the Bankruptcy Rules, the bankruptcy court would have as much, or as little, jurisdiction to hear the subject matter of the adversary proceeding as it *otherwise* had under law—*e.g.*, by reason of summary jurisdiction, and/or jurisdiction under Act § 311 in Chapter XI cases. As noted in *Collier 14th:*

> For Rule 701 and Part VII to apply, the matter itself must be within the jurisdiction, ordinarily labeled as summary jurisdiction, of the bankruptcy court. Neither Rule 701 nor any other rule expands the jurisdiction of the bankruptcy court and, additionally, the rules do not change the summary-plenary jurisdiction distinction that has developed under the Bankruptcy Act.

13 *Collier 14th* ¶ 701.03 at pages 7–7 to 7–8. *Collier 14th* went on to provide:

> Thus, for Part VII to apply, the action must be within the summary jurisdiction of the bankruptcy court and it would be an adversary proceeding. If the action is one by a trustee to recover property, possession of the property, actual or constructive, would have to be in the trustee. Location of title is not relevant in bankruptcy cases, only possession. In Chapter X–XIII cases, summary jurisdiction can attach if the debtor either has possession or title.

*Id.* at page 7–8 (footnotes deleted).

While under the Act, the bankruptcy court would not have had summary jurisdiction over a "recharacterization" dispute of the type considered by Judge Haight in *CIS*—with neither the equipment in question nor the lessor interest in it being in the possession of the trustee [65]—the facts here are exactly the opposite. The equipment in question here is in the actual possession of the Debtor, PSINet, and thus in "the actual or constructive possession" of this Court. As Justice White's analysis makes clear, an exercise by this Court of its *in rem* power over property in this Court's "actual or constructive possession"—the equipment leases in question here—would *not* be an extension of the pre-Code law, and hardly, as Cisco argues, an extension of bankruptcy court jurisdiction of the type ruled to be impermissible under *Marathon*.

(2)

The issue of lease recharacterization was "a familiar one in bankruptcy proceedings" under the former Act. *Telemax Corp., 10 UCC Rep. Serv. 1316; see also Yankee Leasing Co. v. Mountain Carpet, Inc. (In re Mountain Carpet, Inc.)*, 11 B.R. 729, 731 (Bankr.D.Vt.1979) ("There is no paucity of cases which revolve around [whether or not an agreement is a true lease]"). Bankruptcy referees and, later, bankruptcy judges, were frequently called on to determine whether an agreement was a true lease or really a sales contract.[66] In

---

**65.** Rather, the equipment in question was in the possession of various third-party lessees, and the lessor interest was in the possession, to the extent it was in anyone's possession, of the defendant BancOhio, under an adverse claim of ownership based upon a conveyance made before the filing of the bankruptcy.

*Compare Weidhorn*, 253 U.S. at 272, 40 S.Ct. 534.

**66.** *See Allen v. Cohen*, 310 F.2d 312, 314 (2d Cir.1962) (in case under the Act, reversing decision by referee, which had been affirmed by the district court, which held that a lease was really a conditional sale); *Burroughs*

deciding this issue, courts typically made those determinations based on state law—the predecessor of the statute involved in this case, UCC § 1–201(37).[67]

The power of bankruptcy referees and bankruptcy judges to decide such matters under their summary jurisdiction where, as here, the property in question was in the possession of the debtor or trustee, was, so far as this Court can determine, never questioned. *See, e.g., In the Matter of Crown Cartridge Corp.*, 220 F.Supp. 914, 916 (S.D.N.Y.1962) (Croake, J.) (in case under Chapter X of former Act, stating (in course of decision affirming the determination of the referee that "the 'lease' agreement was a conditional sales contract") that the only question on appeal was "whether [the Bankruptcy Referee, the Hon. Asa Herzog] correctly applied [the] law in the instant case").

(3)

For the reasons set forth in this subsection, then, this Court concludes that the determination of the recharacterization matters here—with respect to property in the lawful possession of the PSINet estate, where this Court plainly would have had summary jurisdiction under the former

Act, and would have routinely exercised the power to decide such matters—is a core matter for this reason as well.

*E.*

PSINet has also argued that any ruling holding proceedings like this to be non-core would wreak havoc in its bankruptcy case. While the Court shares Cisco's view, expressed in oral argument, that there is nothing in the Bankruptcy Code that allows a debtor to get around the rights of others "because the debtor really needs something to be able to stay in chapter 11" (Arg. Tr. at 76:12–14, transcription errors corrected), the Court is more sensitive to PSINet's concerns insofar as they bear on the administration of bankruptcy cases generally—again, assuming, of course, that deeming the issues here to be core would otherwise be consistent with the applicable law.

When the Court takes PSINet's stated concerns as only an example of the issues faced by debtors with like factual situations—with ongoing lines of business, with considerable amounts of nominally leased equipment, with many issues under title 11

---

*Adding Machine Co. v. Bogdon (In re Munger Fish Co.)*, 9 F.2d 54, 55 (8th Cir.1925) (in case under the Act, "the sole question presented by this petition to revise is whether this instrument was a lease or was a contract of conditional sale"); *In re Herold Radio & Electronics Corp.*, 218 F.Supp. 284 (S.D.N.Y.1963) (McLean, J.) (in case under the Act, affirming determination of referee that a contract nominally for the lease of goods was really a conditional sale); *In re Rainey*, 31 F.2d 197, 198 (D.Md.1929) ("[T]he court finds that the agreement between the petitioner and the bankrupt, whereby the latter acquired machinery, is a conditional sale contract, and not a lease, as claimed"); *Yankee Leasing Co. v. Mountain Carpet, Inc. (In re Mountain Carpet, Inc.)*, 11 B.R. 729, 730 (Bankr.D.Vt.1979) (in case under the Act, "[t]he issue to be determined is whether the Agreement signed

by the parties is a 'true lease' or in the nature of a Security Agreement . . .").

**67.** *See Yale Express System, Inc. v. Budd Leasing Corp. (In the Matter of Yale Express System, Inc.)*, 11 B.R. 495 (Bankr.S.D.N.Y.1981) (Galgay, J.) (in case under the Act, determining the nature of a lease agreement pursuant to UCC § 1–201(37)); *United General Leasing, Inc. v. Gehrke Enterprises, Inc. (In the Matter of Gehrke Enterprises, Inc.)*, 1 B.R. 647, 650 (Bankr.W.D.Wis.1979) (in case under the Act, discussing applicable test pursuant to the earlier version of UCC § 1–201(37)); *In re Virginia Air Conditioning Co., Inc.*, 11 UCC Rep. Serv. 1260, 1972 WL 20909 (Bankr.W.D.Va. 1972) (in case under the Act, determining that, under earlier version of UCC § 1–201(37) enacted in Virginia, lease was really intended as security).

to be decided with respect to those lines of business and the equipment used in it—the Court finds it easy to agree with PSINet's concerns, and to agree that determining a matter like this to be non-core would be as disastrous to the administration of bankruptcy justice as PSINet argues that it is.

As can be seen from the Debtor's recent litigation with NTFC, it often is necessary in bankruptcy cases, incident to sales of debtor lines of business, to sell equipment in which one or more counter-parties to agreements with debtors have an interest. It is not uncommon for the bankruptcy court to have to determine the nature, if any, of the interest of a counter-party to an agreement with the debtor as a prerequisite to approving, or granting conditional approval to, a sale, often on a very tight time schedule.[68] It likewise is necessary for the courts—in the first instance, at least, bankruptcy courts—to deal with creditors' statutory rights expeditiously—as, for example, the rights of lessors/creditors like Cisco, who are legitimately entitled, even if not to a particular result, to at least expeditious consideration of their statutory entitlements to lease payments under section 365(d)(10) or adequate protection under sections 361 and 363.

While this Court does not share the view voiced in the *Marathon* dissent that district courts would lack the necessary interest in bankruptcy matters to deal with those matters in the tight time-frame justice requires,[69] any procedure requiring determinations of the district court in matters like these would face the dual difficulties of the considerable burdens on district judges resulting from their regular caseloads, and the inherent inefficiencies and delays associated with any system that would require seriatim determinations by two separate courts. It is difficult to see how, particularly with assets of declining value or lines of business that need to be sold promptly in order to realize their full value or to provide needed liquidity to the estate, determinations could await the preparation of proposed findings by the bankruptcy court, then the further proceedings that would be required in the district court, and then the transmission of the result back to the bankruptcy court so that the asset sale could be accomplished

68. For example, when the Debtor wished to sell its Canadian business, a transaction that, if approved without material modification, would net its estate approximately $75 million (US), another equipment lessor, NTFC, asserted that equipment NTFC nominally leased to the Debtor could not be sold without NTFC's consent, and that NTFC was denying such consent. That matter too involved lease recharacterization issues, similar in many respects (though different in others) from those here. The Court had to complete a hearing on the issues NTFC raised on September 24; issue a decision the following morning; and hold the hearing on the underlying sale (in a joint hearing with a Canadian judge, whose approval was also required) the day after. It is difficult, to say the least, to see how that could have been accomplished if the determination of the recharacterization issues had to await the multiple step process of proposed findings by the bankruptcy court; decision by

the district court; and further consideration by the bankruptcy court—even if (though the Court doubts this to be the case) the district judges of this district had no other matters competing for their time.

69. In his dissenting opinion on behalf of three justices in *Marathon*, Justice White stated:

Indeed, the congressional perception of a lack of judicial interest in bankruptcy matters was one of the factors that led to the establishment of the bankruptcy courts: Congress feared that this lack of interest would lead to a failure by federal district courts to deal with bankruptcy matters in an expeditious manner.

*Marathon*, 458 U.S. at 116, 102 S.Ct. 2858 (White, J., dissenting) (citing H.R.Rep. No. 95–595, p. 14 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5963, 5975–5976).

in accordance with the district court's final ruling.

Similarly, it is indeed necessary, as a prerequisite to determining whether an equipment lessor has rights under section 365—to periodic payments under section 365(d)(10), to require assumption or rejection under 365(a), and to cure on assumption, under section 365(b)—to determine first whether the agreement denominated as a lease is indeed a true lease. And if the agreement is not a true lease, the decision is nevertheless the precursor to rights the debtor's counter-party may have instead—most obviously to adequate protection, if the "lessor" is instead a secured creditor, and the collateral is diminishing in value—a matter that may be of particular significance with assets of relatively short useful life, such as computer equipment, or other assets subject to quick depreciation or obsolescence by reason of technological change.

The Court believes that it is fully appropriate to consider practical concerns such as these when determining whether a matter is a core matter with a sufficient nexus to the administration of the estate or to the reordering of the debtor-creditor relationship. In *Arnold Print Works,* the First Circuit noted:

> The resolution of separation of powers questions may also prove sensitive to practical considerations, such as the need to place in a single set of hands the various functions that Articles I, II and III would otherwise keep separate. *See Chadha v. Immigration & Naturalization Service,* 634 F.2d 408, 425 (9th Cir. 1980) ("[C]ourts interpret separation of powers questions pragmatically, in order to preserve the essential design of the Constitution without imposing unwork-

able limitations."), *aff'd* 462 U.S. 919, 103 S.Ct. 2764, 77 L.E.2d 317 (1983); *cf. Schor,* [*supra,* 478 U.S. at 853–854,] 106 S.Ct. at 3258 (considering whether there were practical reasons to find the [Commodity Exchange Act] defective under Article III).

*Arnold Print Works,* 815 F.2d at 170. In *Arnold Print Works,* the First Circuit found that the "risk of litigation in multiple forums" was troublesome enough to be a matter of concern where a debtor was trying to enforce a post-petition contract. That concern was hardly frivolous, but it related to a matter considerably less troublesome that the problems bankruptcy courts would face if the recharacterization matters that the parties have faced in this case—so clearly a prerequisite to deciding matters needing to be decided in the administration of the bankruptcy case—had to be addressed, seriatim, in separate forums. And here, as in *Arnold Print Works:*

> [T]he need for orderly estate management, administration, and distribution would argue more strongly here than in *Marathon* for allowing adjudication by the bankruptcy court, despite its non-Article III characteristics.

*Id.*

### F.

Significantly, Cisco has failed to cite a single case, in any procedural context, ever holding that a recharacterization action with respect to the status of "leased" property within the possession of the estate [70] is non-core—with or without the additional facts present here, with respect to the use of the determination here to decide matters under title 11. The amalgam of the

---

**70.** The significance of "within the possession of the estate" is apparent from Section I(D) of this decision. This is a matter of the type that was long cognizable by bankruptcy referees and judges under their summary jurisdiction under the former Bankruptcy Act.

language of § 157(b); the Supreme Court decisions, Second Circuit authority (particularly *U.S. Lines*) and *PCH Associates;* the historical practice under the former Act; and the effect that any contrary decision would have on bankruptcy administration collectively causes this Court to feel confident that this matter is core—under 28 U.S.C. §§ 157(b)(2)(A), (B), (K), and (O).

The Court will make final determinations with respect to all of the issues here, subject, of course, to the parties' rights to appellate review.

## II.

### Statute of Limitations

■ As the basis for its cross-motion for summary judgment, Cisco argues in substance that under the law of the State of New York, whose statute of limitations should be applied to PSINet's action,[71] (a) this declaratory judgment action should be deemed to be an action for replevin, and that the statute of limitations for such actions is CPLR § 214(3); (b) the statute of limitations begins to run from the time of entry into the Master Agreement (as contrasted to the times of execution of the various Equipment Schedules, when the equipment in question was identified); and (c) because CPLR § 214(3) requires an action to be brought within three years of the time the cause of action accrued, PSINet's action is time-barred, and the declaratory judgment PSINet seeks must be denied.

While the Court doubts the correctness of point (b),[72] the Court does not need to reach that point, as the Court disagrees with Cisco with respect to points (a) and (c). The Court holds that the applicable statute of limitations is not that of CPLR § 214(3), relating to an action to recover a chattel, but rather CPLR § 213(1), relating to actions for which no other limitations period has been specifically provided by law. Under the latter statute, which provides for a period of six years to bring suit, all of the claims asserted here are timely, without the need to focus on whether they arose when the Master Agreement was executed, on the one hand, or the equipment schedules came into being, on the other.

CPLR § 214 provides, in relevant part:

The following actions must be commenced within three years:

. . . .

3. an action to recover a chattel or damages for the taking or detaining of a chattel. . . .

The issue before this Court, then, is whether (at least in the context of the facts here, where the Debtor already has lawful possession of the chattel(s) to be "recovered" and the issue before the Court is the propriety of recharacterization of the terms under which the Debtor has that possession), CPLR § 214(3) applies—and, if not, what other statute of limitations more appropriately applies.

CPLR § 214(3) is not ambiguous, and by its terms plainly is inapplicable. This adversary proceeding is not an action to recover a chattel, or any number of chattels; PSINet already has the chattels—i.e., the equipment—in its lawful possession. Nor

---

**71.** Cisco states that even though the underlying contractual documents provide that they will be construed under the law of State of California, this Court should use the statute of limitations of New York, the forum state, and PSINet does not quarrel with that assertion.

**72.** The Court is troubled by an argument that would start the statute of limitations for recovery of a chattel running on claims when the chattel(s) to be "recovered" had not yet come into being, and/or had not yet been identified.

is the adversary proceeding an action for damages at all, much less for the "taking or detaining" of one or more chattels, which Cisco has neither taken nor detained.

In essence, Cisco tries to string together a chain of alleged equivalencies; it argues in substance that by characterizing the adversary proceeding as one for "Replevin," and then noting that Replevin is an action to recover a chattel, such a string of alleged equivalencies would make the action time-barred. The Court need not parse that logic in excruciating detail because, in the Court's view, this adversary proceeding cannot fairly be described as one for Replevin either.

As PSINet has asked the Court to do, the Court accepts the definition of "Replevin" in *Black's Law Dictionary*; *Black's* defines "Replevin" as:

> [a]n action whereby the owner or person entitled to repossession of goods or chattels may recover those goods or chattels from one who has wrongfully distrained or taken or who wrongfully detains such goods or chattels.

*Black's Law Dictionary* 1299 (6th ed.1990). *See also, e.g., Morgan v. Property Clerk, New York City Police Dep't*, 184 Misc.2d 406, 407, 708 N.Y.S.2d 262, 263 (Sup.Ct. Richmond Co.2000) ("[t]he *sine qua non* of an in rem or replevin action is that the respondent have possession of the property to be returned," though stated in context of third party federal government, rather than the respondent Police Department, having possession of the property in question ($14,000 in cash) to be recovered).

Here, of course, PSINet is not seeking to "repossess[ ]" anything—as it already

has it—and there is no claim that Cisco has "taken" or "wrongfully detains" the equipment in question. Although the Court is mindful of the caution in *Black's* that variations from jurisdiction to jurisdiction and in the particular dispute involved can affect a given definition usage, the Court is entirely comfortable with the *Black's* definition in this context, which comports with the regular use of litigators, common sense, and, most importantly, the words of the statute, CPLR § 214(3).[73]

As authority for its chain of equivalencies, Cisco once more cites *CIS*, this time for the proposition that this "recharacterization" action should be deemed to be one for "Replevin," and then that the action should be subject to CPLR § 214(3). In doing so, however, Cisco asks this Court to make too big a jump, with too much disrespect for the language of CPLR § 214(3), particularly when Cisco tries to apply the wholly different facts in *CIS* to the facts here. In *CIS*, Judge Haight was not asked to, nor did he, construe or consider CPLR § 214(3) (which in fact was never mentioned in his decision), or anything else with respect to the statute of limitations or when it began to run. As important, or more so, the kind of "recharacterization" action Judge Haight was then called upon to consider was one of a fundamentally different type—with respect to property *not* in the possession of the plaintiff, and which was said to have been previously sold by the debtor in a "true sale," which the plaintiff sought judicial rulings that it had not in fact been a "true sale."

It is true that Judge Haight said that "in substance and spirit the Trustee's action is fundamentally an action to determine dis-

---

**73.** Indeed, in the Second Circuit case cited by Cisco, the Second Circuit refers to the 3–year period in the context of a suit with that common meaning. *See DeWeerth v. Baldinger*, 836 F.2d 103, 106 (2d Cir.1987), *cert. denied*,

486 U.S. 1056, 108 S.Ct. 2823, 100 L.Ed.2d 924 ("*Where an owner pursues the party who took his property*, the three-year period begins to run when the property was taken") (emphasis added).

puted *ownership* in property," *CIS*, 172 B.R. at 756 (emphasis in original), which in its broad terms could also apply here. It is also true that Judge Haight cited, albeit without further discussion, CPLR § 7101 (from Article 71 of the CPLR dealing with the procedural mechanisms available for "Recovery of Chattel") and *In re Estate of Schneier*, 74 A.D.2d 22, 23, 426 N.Y.S.2d 624, 625 (4th Dep't 1980) ("*Schneier*")— summarized by Judge Haight as holding that an "action to recover property where title is disputed is in nature of common law replevin." *Id.* But the context of each of that Article of the CPLR and *Schneier*, like the context in *CIS* in which Judge Haight applied them, was property that was *not* already in the hands of the plaintiff which was sought to be recovered.[74]

Thus, provisions of CPLR Article 71, while they might have applied to a factual situation like the one that Judge Haight faced, where the plaintiff did not have the chattel in question,[75] have no applicability here, where the plaintiff already has the chattel(s) to be recovered, and where Cisco is not claiming a right to possession at this time.[76]

Significantly, Cisco cites no case that has ever held that an action to recharacterize contractual obligations relating to chattels already in the plaintiff's possession should be regarded either as "Replevin," or otherwise subject to the limitations period of CPLR § 214(3). Cisco has cited no authority to this Court suggesting that an action to determine the rights associated with property the plaintiff already lawfully has should be regarded as an action "to recover a chattel" for limitations purposes, and the Court finds Cisco's argument to be inconsistent with the plain language of CPLR § 214(3). Particularly where construing—or, more precisely, expanding—the coverage of CPLR § 214(3) in this novel way would cut off parties' rights in a manner nobody could reasonably have anticipated, the Court is not of a mind to engage in such judicial legislation. Cisco's cross-motion for summary judgment under CPLR § 214(3) is denied.[77]

---

74. For example, in *Schneier*, the petitioner brought a proceeding in Surrogate's Court to recover specific certificate of corporate stock and other assets in the hands of the *respondent*, as executor. *See Schneier*, 74 A.D.2d at 23, 426 N.Y.S.2d 624. The standards in the *Black's* definition of Replevin would apply satisfactorily to an action of the type Judge Haight faced, but would not apply at all here.

75. *See, e.g.*, CPLR § 7102 (Seizure of chattel on behalf of plaintiff); § 7103 ("Reclaiming, impounding, or returning chattel"); § 7104 (Seizing, reclaiming or returning less than all chattels). *See also* CPLR § 7102 ("an action may be brought under [CPLR Article 71] to try the right to possession of a chattel"). Cisco does not claim a right to possession at this time and PSINet already has it.

76. In oral argument, Cisco made reference to a scenario under which if, at the end of the lease term(s), PSINet made the decision not to purchase the equipment, possession would revert to Cisco; Cisco characterized PSINet's action, for statute of limitations purposes, as affecting Cisco's rights to possession if PSINet chose not to exercise its option to purchase the equipment from Cisco for a dollar. *See* Arg. Tr. at 19. The Court does not believe that such a characterization really describes what this litigation is about. And to the extent Cisco bases its statute of limitations argument on a future fight for possession in the event that PSINet elects not to exercise an option in the future under which PSINet would get the equipment anyway for only a dollar, that is much too speculative to be relevant to the Court's consideration of the statute of limitations applicable to the PSINet claims being asserted now.

77. Anticipating a question that might then logically be asked—what statute *does* apply to claims of this nature—the Court believes that the answer is CPLR § 213(1), applying a six-year statute to claims for which no other limitations period is prescribed by law, for any of the reasons that the action sounds in equity, may be analogized to an action for

### III.

### Summary Judgment Motion Merits

Cisco's statute of limitations defense having been rejected, the remainder of the analysis on PSINet's summary judgment motion is straightforward.

### A.

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." [78] The moving party bears the initial burden of showing that the undisputed facts entitle the movant to judgment as a matter of law.[79] Then, if the movant carries this initial burden, the nonmoving party must set forth specific facts to show that there are triable issues of fact, and cannot rely on pleadings containing mere allegations or denials.[80]

In this connection, it is well settled, of course, that the court should not weigh the evidence or determine the truth of any matter, and must resolve all ambiguities and draw all reasonable inferences against the moving party.[81] A fact is material if "it might affect the outcome of the suit under governing law." [82] An issue of fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." [83]

### B.

Even for the purpose of making determinations of federal law under the Bankruptcy Code, state law determines the existence, scope and nature of a debt-

---

reformation of a contract, or for lack of any more appropriately applicable limitations period. See David D. Siegel, New York Practice, § 36 (3d ed.1999) (stating that the 6–year statute of CPLR § 213(1) applies to equity actions, including those for reformation of contract, citing Hanover Fire Ins. Co. v. Morse Dry Dock and Repair Co., 270 N.Y. 86, 200 N.E. 589 (1936)). While it could be argued that CPLR § 213(2), with respect to a claim "upon a contractual obligation or liability," applies—even though the essence of the cause of action is not so much a suit upon the contractual obligation or liability as it is to reform it, albeit for reasons different than those (like mutual mistake) that more commonly are used for that purpose—this may be a distinction without a difference, as the statute of limitations would in either case be six years.

**78.** Fed.R.Civ.P. 56 (made applicable to this adversary proceeding by Fed. R. Bankr.P. 7056).

**79.** Rodriguez v. City of New York, 72 F.3d 1051, 1060–61 (2d Cir.1995); Singer Co. B.V. v. Groz Beckert KG (In re Singer Co. N.V.), 262 B.R. 257, 262–263 (Bankr.S.D.N.Y.2001) (Lifland, C.J.) ("The initial burden rests on the

moving party to demonstrate the absence of a genuine issue of material fact ...").

**80.** Fed.R.Civ.P. 56(e). See also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Kittay v. Peter D. Leibowits Co. (In re Duke & Benedict, Inc.), 265 B.R. 524, 529 (Bankr.S.D.N.Y.2001)("[T]he nonmoving party must set forth specific facts that show triable issues, and cannot rely on pleadings containing mere allegations or denials").

**81.** See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. at 587, 106 S.Ct. 1348 (summary judgment is appropriate "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party"); Virgin Atlantic Airways Limited v. British Airways PLC, 257 F.3d 256, 262 (2d Cir.2001); Lovejoy–Wilson v. NOCO Motor Fuel, Inc., 263 F.3d 208, 212 (2d Cir.2001) ("We [ ] constru[e] the evidence in the light most favorable to the non-moving party").

**82.** Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

**83.** Id.

or's property.[84] The determination of whether a "lease constitutes a security interest under the bankruptcy code will depend on whether it constitutes a security interest under applicable state or local law." *In re Powers,* 983 F.2d 88, 90 (7th Cir.1993). The Master Agreement provides that it will be governed by the law of the State of California; thus California law governs the determination of the actual nature of the agreement between PSINet and Cisco.

Under California law, the determination of whether an agreement creates a true lease, on the one hand, or a security interest, on the other, is dependent on the economics of the transaction, and not the intent of the parties. California has adopted UCC § 1–201(37),[85] as amended as a uniform law in 1987 and by the State of California, implementing the uniform law change, in 1988. UCC § 1–201(37) defines the term "security interest," and provides the test for distinguishing between a "security interest," on the one hand, and a "true lease," on the other. Following its amendment in 1988, UCC § 1–201(37) no longer takes into account the actual or stated intent of the parties at the time of the transaction, and instead looks solely to the terms of the agreement itself.

UCC § 1–201(37) implements an objective test "by setting out a bright line test whereby, as a matter of law, a transaction creates a security interest." *In re Owen,* 221 B.R. 56, 60 (Bankr.N.D.N.Y.1998) (Gerling, C.J.).[86] The statute provides, in pertinent part:

> (b) Whether a transaction creates a lease or security interest is determined by the facts of each case. however, a transaction creates a security interest if the consideration the lessee is to pay the lessor for the right to possession and use of the goods is an obligation for the term of the lease not subject to termination by the lessee, and
>
> > (a) The original term of the lease is equal to or greater than the remaining economic life of the goods,
> >
> > (b) The lessee is bound to renew the lease for the remaining economic life of the goods or is bound to become the owner of the goods,
> >
> > (c) The lessee has an option to renew the lease for the remaining economic life of the goods for no additional consideration or nominal additional consideration upon compliance with the lease agreement, or
> >
> > (d) The lessee has an option to become the owner of the goods for no additional consideration or nominal additional consideration upon compliance with the lease agreement.

UCC § 1–201(37)(2001).

Caselaw construing UCC § 1–201(37) explains that a contract that (1) prohibits

---

**84.** *See Butner,* 440 U.S. at 54, 99 S.Ct. 914 ("Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law").

**85.** PSINet has asked for its declaratory relief pursuant to UCC § 1–201(37), consistent with the numbering of the Uniform Laws. Under California's numbering, however, it is referred to as Cal. U. Comm.Code § 1201(36). Cal. U. Comm.Code § 1201(36) and UCC § 1–201(37) are nearly identical, and although the California version of the statute contains

some minor changes from the text of the Uniform Code, they are substantively the same. This opinion will refer to § 1–201(37) for the sake of clarity.

**86.** Although it is California's version of the UCC that applies, the Court is not limited to a discussion of cases decided under California law. *See Edison Brothers,* 207 B.R. at 809 n. 7 ("Since the UCC has been adopted by all 50 states, and given the uniformity purpose of the UCC, decisions from other states are relevant").

the lessee from terminating the obligation to pay the lessor for the right to possession and use of the goods and (2) meets any one of the four enumerated conditions will "establish that the parties entered into a security agreement." *Owen*, 221 B.R. at 61; *see also HPSC, Inc. v. Wakefield (In re Wakefield)*, 217 B.R. 967, 970 (Bankr. M.D.Ga.1998) ("[I]f the lessee is bound for the entire term of the agreement and if any one of the requirements of subparagraphs (a), (b), (c), or (d) are met, then the court's inquiry ends and the transaction is deemed to have created a security interest").

The intent of the parties at the time the agreement was entered into is irrelevant to the determination of whether a true lease has been established.[87] The statute sets forth a test, which looks to the underlying substance of the transaction. If both parts of the statutory test are met, then, as a matter of law, the transaction is really a sale which created a security interest. *In re Macklin*, 236 B.R. 403, 406 (Bankr. E.D.Ark.1999).

### C.

■ Applying the two-part test of UCC § 1–201(37) to the Master Agreement and the Lease Schedules demonstrates that PSINet and Cisco did not create a true lease, and, in fact, entered into a series of secured transactions.[88]

### (1)

The first part of the statutory test requires an inquiry as to whether or not the lease prohibits the lessee from terminating its obligation to pay the lessor the full cost of the equipment covered by the lease before the expiration of the lease term.

*See Fox*, 229 B.R. at 165 ("[T]he threshold requirement of [UCC § 1–201(37) ] is met as the Debtor could not cancel the 'lease agreement' without simultaneously incurring an immediate obligation for the total cost of the [ ] equipment").

Here, the lessee PSINet can terminate the lease early, but not without incurring an obligation for the total cost of the equipment. The Master Agreement provides, in Section 1.2, that "[e]xcept as specifically provided in Section 5.14 no Lease [Schedule] may be terminated by Lessor or Lessee, for any reason whatsoever, prior to the end of the [lease term]." Section 5.14 of the Master Agreement grants PSINet the right to terminate a Lease Schedule early, but only if it pays Cisco a "buyout payment." The buyout payment is an amount that is equal to or greater than the total remaining economic value of the equipment. Sections 1.2 and 5.14, taken together, provide that PSINet cannot terminate its obligation to pay the full cost of the equipment covered by the Lease Schedules before the lease terms expire. Although PSINet can terminate a Lease Schedule early, pursuant to Section 5.14, it can do so only if it pays Cisco the full remaining cost of the equipment covered in the Lease Schedule. Thus, PSINet cannot terminate its obligations pursuant to the Master Agreement and the Lease Schedules without incurring an obligation to Cisco for the full cost of the equipment. Therefore, the first part of the statutory test is satisfied.

### (2)

■ The second part of the statutory test requires the court to determine if any one of four independent factors is present.

---

**87.** It is for this reason that while Cisco's statement in that regard in its 7056–1 Statement is unchallenged, that does not preclude entry of summary judgment.

**88.** The Court makes no determination on this motion whether or not any security interest was satisfactorily perfected or is voidable.

These factors are commonly referred to as the "residual value factors." *See* E. Carolyn Hochstadter Dicker and John P. Campo, *FF & E and the True Lease Question: Article 2A and Accompanying Amendments to UCC Section 1–201(37)*, 7 Am. Bankr.Inst. L.Rev. 517, 537 (Winter 1999). The presence of any one of the factors indicates that the lessor does not retain any "residual interest in the leased property," and that the lease is not a true lease. *Id.; see also Owen*, 221 B.R. at 61; *Kimco Leasing, Inc. v. State Bd. Of Tax Comm'rs*, 656 N.E.2d 1208, 1218 (Ind. Tax Ct.1995) ("[T]he court must determine 'whether the lessor retains a meaningful residual interest' in the leased property at the end of the lease term"). Essentially, "[u]nder the test, the touchstone for making the determination is whether the lessor retained an economically significant reversionary interest." *In re Allen*, 174 B.R. 293, 295 (Bankr.D.Or.1994).

██ In this case, two of the residual value factors are met. The fourth factor, which most plainly is applicable, requires an inquiry as to whether or not "[t]he lessee has an option to become the owner of the goods for no additional consideration or nominal additional consideration upon compliance with the lease agreement." UCC § 1–201(37)(d). Consideration is considered nominal if the only economically sensible option for the lessee is to exercise the option. *Venn v. Howell's Auto Repair Ctr. (In re Howell)*, 161 B.R. 285, 289 (Bankr.N.D.Fla.1993). It is well established that an option price of a dollar is nominal within the meaning of UCC § 1–201(37), and where such an amount is agreed to, there is no need to delve into an analysis of the economic sensibility of purchasing the equipment for that price.[89]

The Master Agreement provides that PSINet may purchase the equipment listed in the Lease Schedules for a dollar at the end of the lease term. Since the price of a dollar to exercise the purchase option is nominal consideration, PSINet has the required option to purchase the Equipment for a nominal price at the end of the Lease Schedule. Thus, the requirements of subsection (d) of the statute are met, along with the requirements of the introductory portion of the statute, and the Master Agreement and the Lease Schedules are not "true leases" as a matter of law.

A second, wholly independent, factor also satisfies the second part of the statutory test. The statute provides that a true lease does not exist when the first part of the statutory test is met and "[t]he original term of the lease is equal to or greater than the remaining economic life of the goods." UCC § 1–201(37)(a). The rationale behind this factor was explained by the Seventh Circuit:

> An essential characteristic of a true lease is that there be something of value to return to the lessor after the term. Where the term of a lease is substantially equal to the life of the leased property such that there will be nothing of value to return at the end of the lease, the transaction is in essence a sale.

*In re Marhoefer Packing Co., Inc.*, 674 F.2d 1139, 1145 (7th Cir.1982) (internal citations omitted); *see also Edison Brothers*, 207 B.R. at 816 (quoting *Marhoefer*).

In this case PSINet asserted, in its 7056–1 Statement, that the equipment

---

**89.** *See In re Eagle Enterprises,* 237 B.R. 269, 272 (E.D.Pa.1999) (recognizing that a $1.00 purchase option price is nominal consideration under UCC § 1–201(37)); *In re Macklin,* 236 B.R. 403, 407 (Bankr.E.D.Ark.1999) (finding that the second part of the statutory test was met where the debtor had the option to buy the equipment for one dollar at the end of a lease term); *In re Fox,* 229 B.R. at 165; *In re All Am. Mfg. Corp.,* 172 B.R. 394, 398 (Bankr.S.D.Fla.1994) ("[T]he $1.00 purchase price ... represents nominal consideration").

would have no remaining economic value at the end of each lease term, and Cisco did not dispute that assertion. Therefore, under Local Rule 1–7056(c), that fact is deemed admitted for the purposes of summary judgment, and the Court properly may consider it in determining whether the requirements of UCC § 1–201(37) are satisfied. The requirements of subsection (a) are satisfied by reason of the fact that the equipment listed in the Lease Schedules will have no remaining economic value at the termination of the Lease Schedules. Again, both parts of the statutory test are met. Therefore, the Master Agreement and Lease Schedules are not "true leases" as a matter of law.

### Conclusion

For the foregoing reasons, summary judgment in Cisco's favor is denied, and summary judgment in PSINet's favor is granted. The foregoing shall constitute the Court's findings of fact and conclusions of law underlying its determination. Plaintiff PSINet is authorized and directed to settle separate orders denying Cisco's motion for summary judgment and granting PSINet's motion for summary judgment, and a separate judgment granting the declaratory relief PSINet seeks,[90] all in accordance with this decision, on no less than five business days' notice, by hand or fax, on Cisco. The time to appeal with respect to those orders and judgment will run from the time of their entry, and not from the entry of this decision.

---

**90.** While the order denying Cisco's summary judgment motion would be interlocutory, and the order granting PSINet summary judgment and judgment granting PSINet the requested declaratory relief would be final (which is why the Court believes separate orders should cover the rulings on each of the two cross-motions), the Court can envision a scenario in which the district court, on any appeal, would want to consider all issues together. Any such decision is wholly within the discretion of the district court.